**BROOKSHIRE BROTHERS, INC., Appellant,**

v.

**Wesley SMITH, Appellee.**

No. 01–02–00677–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 13, 2004.

Supplemental Opinion Denying Further Rehearing and En Banc Reconsideration Feb. 17, 2005.

Curtis W. Fenley III, Warren T. McCollum, Fenley & Bate, L.L.P., Lufkin, TX, for Appellant.

Alice Oliver–Parrott, Maria Teresa Arguindegui, Burrow & Parrott, L.L.P., Houston, TX, Reese Andrews, Nacogdoches, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and HIGLEY.

## OPINION ON REHEARING

ELSA ALCALA, Justice.

Appellee, Wesley Smith, has filed a motion for rehearing and a motion for rehearing en banc of our opinion on rehearing, issued on December 31, 2003. Appellant, Brookshire Brothers, Inc. (Brookshire), has filed a response to both motions. We grant rehearing, withdraw our opinion of December 31, 2003, issue this opinion in its stead, and vacate our judgment of December 31, 2003. Accordingly, we deny the motion for rehearing en banc as moot.[1]

In this chemical-exposure case, Brookshire appeals a jury verdict rendered in favor of appellee, Wesley Smith, for injuries Smith claims that he sustained when he was exposed to commercial cleaning products while employed by Brookshire. The jury awarded Smith $46,000 in actual damages and $250,000 in punitive damages, but the trial court reduced the punitive-damages award to $200,000. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon Supp.2004). In seven issues, Brookshire challenges the legal sufficiency of Smith's causation evidence, the admissibility of that evidence, and the jury's finding of malice. We reach only the legal-sufficiency issue and reverse and render judgment that Smith take nothing.

---

1. *See Giesberg v. State,* 945 S.W.2d 120, 131 n. 3 (Tex.App.-Houston [1st Dist.] 1996), *aff'd,* 984 S.W.2d 245 (Tex.Crim.App.1998).

## Background

In September 1995, Smith was employed as a general maintenance worker at a Brookshire grocery store. During an evening shift, Doug Kranzler, Smith's immediate supervisor, directed Smith to clean the walls and vents of the store's bakery. Kranzler provided Smith with several commercial cleaners, including Clorox Liquid Bleach, Easy–Off Oven Cleaner, Lime–A–Way, Scrubbing Bubbles, and Clorox Formula 409. After Smith began applying the commercial cleaners in the bakery, he experienced irritation to his eyes, skin, nose, and throat. Smith complained to Kranzler about the irritation and asked for protective gear to wear while cleaning the bakery. Kranzler informed Smith that protective gear was not available and directed Smith to complete his work. Despite persistent irritation, Smith continued cleaning the bakery.

On the following evening, Kranzler again directed Smith to use the same combination of commercial cleaners to clean the store's bathroom. Kranzler did not provide Smith with any protective gear, and Smith experienced the same irritations as those of the previous evening. Smith left at the end of his shift, feeling ill. Smith's parents, concerned about his condition, took him for emergency-room treatment. Smith was diagnosed with reactive airways dysfunction syndrome (RADS), an asthmatic condition that impairs breathing and oxygen flow.

Smith sued Brookshire for personal injuries, alleging that Brookshire's negligence and failure to provide a reasonably safe workplace proximately caused his RADS. At trial, Smith presented excerpts of the deposition testimony of Gary Friedman, M.D., a board-certified specialist in pulmonary disease and internal medicine, as his sole evidence of causation.[2] Dr. Friedman testified that the September 1995 chemical exposure proximately caused Smith to suffer from either RADS or a similar asthmatic condition. Dr. Friedman based his opinion on material safety data sheets (MSDS), the commercial cleaners' warning labels, Smith's medical records, and Smith's personal account of his exposure to commercial cleaners on the evenings in question. The MSDS and warning labels identified the contents of the commercial cleaners and the health hazards associated with each. Dr. Friedman clarified, however, that he was not an expert in chemistry. He did not know which commercial cleaner, or combination of cleaners, caused Smith's RADS and did not know the amount of chemical concentration to which Smith had been exposed. At no point did Dr. Friedman refer to any scientific literature associating RADS with commercial cleaners.

## Causation and Chemical Exposure

In its fifth issue, which is dispositive of this appeal, Brookshire contends that the evidence was legally insufficient to prove that Smith's RADS resulted from chemical exposure. This issue requires us to decide whether the causation evidence Dr. Friedman offered was scientifically reliable and

2. Smith also presented the testimony of Smith's treating physician, G.W. Dahlberg, M.D., and an industrial-hygiene expert, Vernon E. Rose, Ph.D. Dr. Dahlberg testified that Smith suffered from RADS. Dr. Rose testified that Brookshire failed to provide Smith with a reasonably safe workplace and that this failure constituted malice. Neither Dr. Dahlberg nor Dr. Rose testified that Smith's exposure to the commercial cleaners caused RADS, and Smith concedes on appeal that neither doctor "was called to testify ... [regarding] causation." Thus, we evaluate Dr. Friedman's testimony as Smith's sole evidence of causation.

thus more than a scintilla of evidence to support the judgment in Smith's favor.

## A. Preservation of Error

 As a preliminary matter, we address Smith's contention that Brookshire did not preserve error. "To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered." *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 251 (2004) (quoting *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998)). An objection made after the jury has returned its verdict comes too late. *Id.* (quoting same). The purpose of the timeliness requirement is twofold: to allow the offering party "an opportunity to cure any defect" and to prevent "trial and appeal by ambush." *Id.* (quoting same).

In *Kerr–McGee Corporation,* the expert testimony of Michael Riley was the only evidence offered on the amount of damages for breach of an implied covenant to protect a leasehold. 133 S.W.3d at 247. After cross-examining Riley, Kerr–McGee objected and moved to strike the testimony as unreliable. *Id.* The trial court overruled the motion and entered judgment on the jury verdict, and the court of appeals affirmed. *Id.* On Kerr–McGee's petition for review, the supreme court concluded that Riley's expert testimony was unreliable and, therefore, no evidence. As here, the responding party argued that Kerr–McGee did not timely object and therefore had not preserved error. *See id.* at 251, 133 S.W.3d at 250–51. The supreme court held that Kerr–McGee preserved error, as required by *Maritime Overseas v. Ellis,* by objecting to Riley's testimony immedi-

ately after cross-examining him. *Kerr–McGee Corp.,* 133 S.W.3d at 252.

Before trial began, Brookshire moved to strike Dr. Friedman's testimony on the grounds that it was scientifically unreliable. The trial court considered this motion at a pretrial hearing and overruled Brookshire's objection.[3] Dr. Friedman testified at trial through excerpts of his deposition read into the record. Before his testimony was offered, the trial court ruled on the objections that Brookshire had made during the deposition and thus clarified which excerpts would come into evidence. As Dr. Friedman's deposition testimony was presented, Brookshire objected again to Dr. Friedman's testimony, as follows: "[H]e is not qualified based on *Daubert–Havner.* He does not know the chemical concentrations and does not know the chemicals and does not know the exposures. His testimony is based on MSDS sheets, which is improper scientific evidence." Brookshire's objection occurred just before the portion of Dr. Friedman's testimony in which he referred to MSDS sheets. The trial court overruled Brookshire's objection, noting, "Your objection is overruled. You have it on the record."

We conclude that Brookshire complied with the timeliness requirements of *Maritime Overseas v. Ellis* by moving to strike and exclude Dr. Friedman's testimony, both before trial began and during trial, on the grounds that his expert testimony was not reliable. There was no trial by ambush, and there has been no appeal by ambush. *See Kerr–McGee Corp.,* 133 S.W.3d at 251.

## B. Standard of Review

 Brookshire's burden on appeal is to demonstrate that there is no evidence to

---

**3.** Although Brookshire captioned its motion as a "Motion in Limine to Exclude Expert Witnesses," both the motion and the reporter's record show that the purpose of the motion was to bar Dr. Friedman from testifying. Indeed, Smith's trial counsel referred to Brookshire's pretrial motion as seeking that result.

support the adverse judgment in favor of Smith. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In determining whether there is no evidence of probative force to support a jury's finding, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference in the prevailing party's favor. *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). We will sustain a no-evidence point when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

To establish causation in a personal-injury suit, a plaintiff must prove that the defendant's conduct caused an event and that this event caused the plaintiff to suffer compensable injuries. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Coastal Tankships, U.S.A., Inc. v. Anderson,* 87 S.W.3d 591, 603 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). When a lay person's general experience and common sense will not enable that person to determine causation, expert testimony is required. *Coastal Tankships,* 87 S.W.3d at 603. Expert testimony is particularly necessary in chemi-cal-exposure cases, in which medically complex diseases and causal ambiguities compound the need for expert testimony. *See id.; see also Hernandez v. Tex. Employers' Ins. Ass'n,* 783 S.W.2d 250, 252–53 (Tex.App.-Corpus Christi 1989, no writ) (holding that expert testimony needed to determine cause of asthma, which had uncertain causal nature).

Expert testimony must be reliable; otherwise, it is not evidence.[4] *See Havner,* 953 S.W.2d at 712–13; *Coastal Tankships,* 87 S.W.3d at 610. An expert's bare opinion will not suffice. *Havner,* 953 S.W.2d at 711. We review an expert's testimony in its entirety and will not accept the expert's opinion as some evidence merely because the expert used "magic words." *Id.* Expert testimony that is not based on reasonable medical probability, but relies instead on possibility, speculation, or surmise, does not assist the jury and cannot support a judgment. *See id.* at 712.

Much like toxic-tort plaintiffs, chemical-exposure plaintiffs must prove both general and specific causation. *See Havner,* 953 S.W.2d at 714; *Coastal Tankships,* 87 S.W.3d at 602. General causation asks whether a substance is capable of causing a particular injury in the general population; specific causation asks whether that substance caused a particular individual's injury. *Id.* Proving one type of causation does not necessarily prove the other, and logic dictates that both are needed for a chemical-exposure plaintiff to

---

4. The following non-exclusive factors may be considered in determining reliability: (1) the extent to which the expert's theory has been or can be tested; (2) the extent to which the expert's technique relies upon his own subjective interpretation; (3) whether the expert's theory has been subjected to peer review and publication; (4) the potential rate of error of the theory; (5) whether the expert's theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the expert's theory or technique. *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995).

prevail.[5] *Id.; Minn. Mining & Mfg. Co. v. Atterbury,* 978 S.W.2d 183, 199–200 (Tex. App.-Texarkana 1998, pet. denied).

## C. Dr. Friedman's Testimony

■ Smith contends that Dr. Friedman based his causation opinion on (1) specialized training and experience, (2) Smith's medical records and his account of the exposure in question, (3) the MSDS and the commercial cleaners' warning labels, and (4) "other peer review articles." After reviewing Dr. Friedman's testimony in its entirety, we conclude that his testimony cannot support the judgment in Smith's favor because Dr. Friedman's opinion does not provide scientifically reliable proof of general causation.

■ Dr. Friedman did not present a scientific foundation regarding general causation, as required by *Havner. See id.* at 714. Specifically, Dr. Friedman did not refer to a single epidemiological study or scientific article to prove that exposure to commercial cleaners can cause RADS. Although Dr. Friedman testified that Lime–A–Way decomposes into a toxin "known to cause RADS," he did not substantiate that conclusion with any scientific evidence. Rather, without presenting a scientific basis for general causation, Dr. Friedman opined that Smith's exposure to toxins in the commercial cleaners, as identified in the MSDS and warning labels, caused either RADS or a similar asthmatic condition. A jury may not presume general causation, however. *See Coastal Tankships,* 87 S.W.3d at 610–11. The absence of any general-causation evidence, combined with the absence of reliable scientific literature, creates a fatal evidentiary gap in Smith's claim. *See id.; see also Havner,* 953 S.W.2d at 712 (citing *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir.1996) (an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process)).

### 1. *Specialized Training and Experience*

■ Although Dr. Friedman is an accomplished physician with extensive training and expertise, the controlling issue is not the adequacy of his qualifications but whether his opinion testimony was scientifically reliable. No matter how qualified an expert is, his opinion must still demonstrate scientific indicia that evidences reasonable medical probability before the opinion can be accorded evidentiary value. *See Havner,* 953 S.W.2d at 712. Without a scientific indicia of reliability, the expert's opinion is mere speculation. *See id.* To the extent that Smith argues that Dr. Friedman relied on his own education, training, and expertise in forming his opinion, therefore, Smith's argument relates only to Dr. Friedman's qualifications and does not address reliability.

### 2. *Smith's Medical Records and Personal Account of the Exposure*

Smith contends that Dr. Friedman's testimony regarding Smith's medical records and his personal account of the exposure in question sufficiently demonstrated scientific reliability.[6] The excerpts of Dr. Fried-

---

**5.** A plaintiff may not be able to offer direct, reliable evidence of specific causation. *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 715 (Tex.1997). A plaintiff may, however, be able to prove specific causation circumstantially by offering general-causation evidence, such as epidemiological studies, and by showing similarities between himself and the studies' subjects. *Id.* at 720; *Coastal*

*Tankships, U.S.A., Inc. v. Anderson,* 87 S.W.3d 591, 603 n. 21 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

**6.** The medical records were obtained from Smith's treating physicians, G.W. Dahlberg, M.D., C. Wayne Lawrence, Ph.D., and Richard Jackson, M.D. Dr. Dahlberg and Dr. Jackson treated Smith for RADS during the time of Dr. Fried-

man's deposition testimony that Smith read to the jury, however, did not connect Smith's medical records or his personal account of the exposure with a scientific showing of general causation. Dr. Friedman's testimony regarding the medical records related to the type and extent of Smith's injury without offering a scientific insight into the general causes of Smith's condition. Smith attempts to substantiate Dr. Friedman's causation opinion by emphasizing portions of Dr. Friedman's testimony that do not relate to general causation. There was no showing at trial that Smith's medical records addressed whether the commercial cleaners at issue were generally capable of causing RADS. To prove general causation, Dr. Friedman needed to put forth a scientific foundation. *See id.* at 719.

### 3. MSDS and Warning Labels

The record shows that Dr. Friedman based his causation opinion on the MSDS and the warning labels of the commercial cleaners Smith used. Dr. Friedman's extensive reliance on the MSDS and warning labels was nevertheless insufficient because neither the MSDS nor the warning labels, standing alone, provide the type of specific, detailed showing of scientific reliability required to accord evidentiary value to an expert's opinion. *See Coastal Tankships*, 87 S.W.3d at 611 (holding that medical records, discharge summaries, and

MSDS were insufficient to establish scientific reliability); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278 (5th Cir.1998) (noting that MSDS have limited value in determining causation because of lack of evidence showing what tests were conducted in compiling MSDS). Smith is correct in asserting that the MSDS and the warning labels identified particular toxins in the commercial cleaners. Lime–A–Way's MSDS and warning label, for example, identified asthma or RADS as a potential injury that could result from high levels of exposure. But the MSDS and warning labels did not demonstrate, scientifically, that the particular toxins at issue generally cause RADS.[7] *See Moore*, 151 F.3d at 278; *Coastal Tankships*, 87 S.W.3d at 611. There was no evidence produced at trial that discussed the scientific foundation used in formulating the conclusions contained in either the MSDS or the warning labels. Thus, even with the MSDS and warning labels, an evidentiary void concerning general causation remained in Dr. Friedman's opinion. This void could have been remedied only by an established, scientific connection between the commercial cleaners and RADS. *See Moore*, 151 F.3d at 278.

### 4. "Other Peer Review Articles"

Smith argues that Dr. Friedman established the necessary scientific connection

---

leading up to trial, and Dr. Lawrence treated Smith for anxiety.

**7.** In contending that Dr. Friedman's reliance on the MSDS provided an adequate scientific basis for general causation, Smith relies on *Curtis v. M & S Petroleum*, 174 F.3d 661 (5th Cir.1999). In *Curtis*, however, the expert cited several scientific studies in support of his premise regarding general causation. *See id.* at 669. The court noted that "both scientific literature and strong circumstantial evidence support the causal connection." *Id.* at 670. *Curtis* did not, as Smith contends, reject

*Moore's* holding that, in the absence of an established scientific connection between the chemical exposure and illness, MSDS are insufficient to show reliability. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 (5th Cir.1998). In this case, because Dr. Friedman did not establish a scientific connection between Smith's exposure to commercial cleaners and RADS, his reliance on MSDS was not sufficient to place evidentiary value on his causation opinion. *See Havner*, 953 S.W.2d at 712–13 (holding that expert testimony that is not reliable is not evidence).

when he testified regarding "other peer review articles," including an article by Arch Carson, M.D., before providing the causation opinion. Although Dr. Friedman briefly answered a question regarding Dr. Carson's article, Dr. Friedman mentioned the article only in passing and never referred to it for the proposition that the commercial cleaners at issue generally cause RADS.[8] In addition, although he discussed MSDS extensively, Dr. Friedman did not discuss Dr. Carson's article in his causation report. The record does not, therefore, support Smith's assertion that Dr. Friedman relied on Dr. Carson's article in forming an opinion regarding general causation.

As to any "other peer review articles," the only other article to which Dr. Friedman referred during his testimony was an article published in the *American Review of Respiratory Disease.* This article outlines the American Thoracic Society's guidelines on the evaluation of asthma impairment and disability, but is apparently a diagnosis guide that is unrelated to causation. There was no testimony at trial that referenced the article as scientific evidence of general causation. Contrary to Smith's contention, the article appears irrelevant to the issue of general causation.

### Conclusion

In sum, the excerpts of Dr. Friedman's deposition testimony that Smith read to the jury did not present a general-causation opinion based on reasonable medical probability. Dr. Friedman provided no scientific support for his theory that

Smith's exposure to the commercial cleaners in question was capable of causing RADS. The analytical gap between Dr. Friedman's causation opinion and the scientific data advanced to support that opinion was simply too wide. *See Moore,* 151 F.3d at 279. Because Smith's causation expert provided opinion testimony that was mere conjecture and, therefore, not evidence, we hold that no scientifically reliable evidence supports the jury's verdict in favor of Smith. *See Havner,* 953 S.W.2d at 712.

We sustain issue five. We need not address Smith's remaining issues.

We reverse the judgment of the trial court and render judgment that Smith take nothing.

## SUPPLEMENTAL OPINION ON MOTIONS FOR FURTHER REHEARING AND FOR EN BANC RECONSIDERATION

ELSA ALCALA, Justice.

Appellee, Wesley Smith (Smith), has challenged our opinion issued on rehearing on May 13, 2004 by filing a "Motion for Rehearing En Banc." We construed Smith's motion as requesting both further rehearing and en banc reconsideration.[1] We have denied further rehearing, and the en banc Court has voted to deny en banc reconsideration.

We issue this supplement to our opinion of May 13, 2004 to (1) explain the settled practice that this Court follows when a

---

8. At one point during the testimony, Smith asked Dr. Friedman the following question regarding plaintiff's exhibit 19:

 Smith's Counsel: No. 19, this is an article that was written by Dr. Carson, along with a coauthor; and it indicates, I believe, that one of the determinants of injury, and I turn your attention to page 519, it says,

"Determinants of injury." And it says, "Toxic factors." Is one of those factors, Dr. Friedman, the duration of exposure?
 **Dr. Friedman:** Yes.

1. The Rules of Appellate Procedure contain no provisions for "rehearing en banc." *See* TEX.R.APP. P. 49.7 (En Banc Reconsideration).

party timely files both a motion for rehearing or further rehearing and a motion for en banc reconsideration, as we described that practice in *Butler v. State*, 6 S.W.3d 636, 637 n. 1 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd), and thus clarify that (2) the *Butler* practice applies in civil cases.

## Procedural Background

This Court has issued three opinions in this case—an original opinion, issued on July 31, 2003, and two opinions on rehearing, issued on December 31, 2003 and May 13, 2004. Smith challenged each of these by filing a single motion in which he requested both rehearing by the original panel of justices who decided the case and reconsideration by the en banc Court. Appellant, Brookshire Brothers, Inc., responded to all three motions. The Court has applied the same procedural practice to each of Smith's challenges to the three opinions. The panel of justices who heard the case has twice granted Smith's motions for rehearing by issuing a new opinion and judgment. These issued on December 31, 2003 to replace the July 31, 2003 opinion and judgment, and on May 13, 2004 to replace the December 31, 2003 opinion and judgment. Smith's motions for en banc reconsideration of the July 31, 2003 and December 31, 2003 opinions were rendered moot when the original panel granted rehearing.[2]

After we issued our May 13, 2004 opinion on rehearing, Smith timely filed a "Motion for Rehearing en Banc." We construed that motion as requesting both further rehearing and en banc reconsideration. The

justices who participated in the May 13, 2004 panel opinion considered Smith's motion, to the extent that it constituted a motion for further rehearing, but concluded that it had no merit. Smith's motion was then presented to the en banc Court, which voted to deny en banc reconsideration.

## Discussion

■ A motion for rehearing differs from and serves a different purpose than a motion for en banc reconsideration. For example, stricter time limits govern the motion for rehearing than govern the motion for en banc reconsideration. *Compare* Tex.R.App. P. 49.1 (must file motion for rehearing within 15 days after court-of-appeals judgment is rendered) *with* Tex. R.App. P. 49.7 (may file motion for en banc reconsideration while court of appeals has plenary jurisdiction);[3] *see also* Tex.R.App. P. 19.1 (plenary power of court of appeals expires 60 days after judgment if no timely filed motion to extend time or motion for rehearing is then pending); Tex.R.App. P. 41.2(c) (stating that en banc reconsideration is disfavored and listing standards); Tex.R.App. P. 49.7 (reconsideration en banc suspends finality of panel's judgment or order).

■ Whether seeking rehearing, pursuant to rule 49.1, or further rehearing, pursuant to rule 49.5, a party's sole purpose is to convince the panel of justices who considered the case to change the decision because it was erroneous—for whatever reason. *See* Tex.R.App. P. 49.1,

---

2. *See Hartrick v. Great Am. Lloyds Ins. Co.*, 62 S.W.3d 270, 272 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (opinion on rehearing; citing *Giesberg v. State*, 945 S.W.2d 120, 131 n. 3 (Tex.App.-Houston [1st Dist.] 1997) (opinion on rehearing), *aff'd*, 984 S.W.2d 245 (Tex. Crim.App.1998)).

3. Thus, a party who does not timely file a motion for rehearing or timely move for an extension of time to file a motion for rehearing, pursuant to rule 49.8, is limited to seeking en banc reconsideration within the period of the appellate court's plenary power. *See* Tex.R.App. P. 19.1(a), 49.7, 49.8.

49.5; *see also* TEX.R.APP. P. 49.3 (authorizing majority of justices who participated in the case to grant rehearing). In contrast, en banc reconsideration is limited to situations in which (1) en banc reconsideration is necessary to secure or maintain uniformity of the Court's decisions or (2) extraordinary circumstances require en banc consideration. *See* TEX.R.APP. P. 41.2(c).

Smith's "Motion for Rehearing en Banc" begins by arguing that extraordinary circumstances require en banc consideration of this case and thus invokes one of the standards of rule 41.2(c). *See id.* The arguments in the motion, however, repeatedly assert that "the panel opinion is wrong." The substance of the motion thus concerns matters pertinent to motions for further rehearing under rule 49.5 and matters concerning rule 41.2(c).

 When a party timely files both a motion for rehearing or further rehearing and a motion for en banc reconsideration, it has long been the practice of this Court to present the motion for rehearing or further rehearing to the original panel of justices who heard the case; if the panel denies rehearing or further rehearing, as here, the motion for en banc reconsideration is then presented to the en banc Court. *See Butler v. State*, 6 S.W.3d 636, 637 & n. 1 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd); *see also Barker v. Eckman*, No. 01-01-00079-CV, slip op. at 2, 2004 WL 163462 at *1 (Tex.App.-Houston [1st Dist.] Jan. 22, 2004, pet. granted) (mem. opinion on rehearing; citing *Butler* for discussion of treatment of motions for en banc consideration).[4]

Having considered the merits of Smith's "motion for rehearing en banc," we deny the motion to the extent that it constituted

a further motion for rehearing under rule 49.5. *See* TEX.R.APP. P. 49.5. On presentation of Smith's request for en banc reconsideration, the en banc Court denied reconsideration en banc. *See* TEX.R.APP. P. 49.7.

### Conclusion

We deny further rehearing.

En banc reconsideration was requested. No majority of the en banc Court having voted for reconsideration, en banc reconsideration is denied.

---

4. If the panel grants rehearing, however, as occurred here twice previously, then the "Motion for Rehearing En Banc" is rendered

moot. *See Hartrick*, 62 S.W.3d at 272 (citing *Giesberg*, 945 S.W.2d at 131 n. 3).