Opinion issued May 2, 2011.


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 


In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-11-00198-CV

———————————

IN RE Tammy Fountain, Relator



 



 

Original Proceeding on Petition for Writ of Mandamus



 



 

MEMORANDUM OPINION
ON REHEARING

          Relator
Tammy Fountain has filed a motion for en banc reconsideration of our March 25,
2011 memorandum order denying her petition for writ of mandamus without opinion.  See Tex. R. App. P. 52.8(d), 52.9.  Having received a response from real party in
interest Kathy Katcher, we withdraw our prior order and issue this opinion in
its stead, rendering the motion for en banc reconsideration moot.  See
Brookshire Bros., Inc. v. Smith, 176 S.W.3d 30, 33 (Tex. App.—Houston [1st
Dist.] 2004, pet. denied).  By her petition,
Fountain seeks a determination that Katcher lacks standing to seek appointment
as a managing conservator of Fountain’s child. 
Our disposition remains the same. 
On this record, we conclude that Fountain is not entitled to mandamus
relief from the trial court’s conclusion that Katcher has standing to file her
petition.

Background

As required under the applicable standard of review, we
accept as true the jurisdictional fact allegations of the real party in
interest for purposes of our standing analysis in this original proceeding.[1]  Our recitation of the factual allegations is
not intended to suggest anything about what the appropriate fact-finder should determine
for purposes of future proceedings in this matter.

One year ago, Tammy Fountain and Kathy Katcher ended a
relationship that lasted approximately seven years.  Beginning in April 2008, before their separation,
the two women began caring for an infant boy at the request of his biological
father.  According to the father’s
affidavit testimony, he initially agreed to share possession of and
responsibility for the child with Katcher and Fountain.  The arrangement was that the child, S.J.F., would
spend the first half of the week with the biological father and his family, and
he would spend the second half of the week at Katcher’s house with her and
Fountain.  This arrangement continued for
some time, but the father eventually became “comfortable with the idea” that
Katcher would legally adopt S.J.F. 

In October 2009, a change in circumstance prompted the two
women to seek adoption of the child.  S.J.F.’s
biological mother gave birth to another child, and drugs were found in the
newborn’s system.  Child Protective
Services intervened.  Fearing that S.J.F.
would be placed in foster care, Fountain and Katcher sought an adoption.  According to Katcher, Fountain proposed that an
adoption could be finalized more expeditiously if she were named the sole
adoptive parent.  Katcher contends that the
two women agreed to add Katcher as a second adoptive parent at a later date.[2]  Katcher paid some or all of the attorney’s
fees incurred during the adoption proceedings. 
When the adoption became final in December 2009, Fountain was the only
adoptive parent listed on the certificate of adoption.

Both women claim to have been the child’s primary
caretaker.  During their relationship,
Fountain and Katcher maintained separate residences located approximately three
and one half miles apart.  Though living
separately, they often spent evenings and nights together with S.J.F. at the
home of one or the other.  Katcher testified
that because she worked from home, she assumed primary responsibility for S.J.F.’s
care for a substantial amount of the time she and Fountain were together.  Specifically, she stated that S.J.F. was in
her care 95 percent of the time and that she paid most of his
expenses.  Katcher bought food, clothing,
toys, and medicine for S.J.F., all of which were kept at her house.  She made improvements to her home to make it
safe for the child, and she had a place for him to sleep there.  In preparation for the adoption home study, Katcher
also paid for improvements to Fountain’s home. 
Katcher asserts that without such improvements Fountain’s home would not
have been suitable for a child.[3]

Katcher claims that she acted as a parent to S.J.F. by
locating, investigating, and selecting his daycare provider.  She also attended medical appointments with him.  Katcher testified that the time she spent
with S.J.F. increased in the months following the adoption due to Fountain’s
heavy workload.  A friend and
professional colleague of Katcher testified by affidavit that Katcher “cared
for the child several days a week through 2008, the entire year of 2009 and in
2010 on an almost daily basis.”  A
neighbor of Fountain who sometimes performs work on Katcher’s home testified
that between September 2009 and April 2010, he observed Katcher
caring for S.J.F. five or six days per week. 
According to Katcher, all of this evidence demonstrates that she
developed a significant relationship with S.J.F. between April 2008 and April
2010.

The nature of the women’s former relationship is disputed.  Katcher asserts that the women enjoyed a
committed relationship, pointing to Fountain’s own testimony that the two women
spent most evenings and nights together. 
Katcher also presented evidence that, for a period of time before S.J.F.’s
adoption, she was listed as a domestic partner on Fountain’s health insurance
policy.  The two women had considered
adopting other children together in the past. 
After the adoption of this child, Fountain wrote to her attorney to
inquire about the process of adding Katcher as an adoptive parent.[4]  The child’s biological father testified that
the two women were in a committed relationship and that he intended that they
would both become S.J.F.’s parents.

The couple’s permanent separation in April 2010 gave rise to
the underlying suit.  Katcher filed suit
on May 21, 2010, alleging that Fountain began denying access to S.J.F. almost
immediately after their break-up.  Katcher’s
pleadings do not raise any issue relating to the result of the adoption
proceedings, nor does she contend Fountain is an unfit parent.  Instead, Katcher asserts her own claim of rights
with respect to S.J.F., and she asks to be named sole managing conservator of
the child.  See Tex. Fam. Code Ann. §
153.371 (West 2008).  Alternatively,
she seeks to establish a joint managing conservatorship with Fountain.  See id.
§ 153.372 (West 2008).  

Fountain responded by filing a motion to dismiss, challenging
Katcher’s standing to initiate an original suit affecting the parent-child
relationship.  An associate judge denied
Fountain’s jurisdictional challenge by written order on October 8, 2010.  The order provides in pertinent part:

5.       The
Court finds that KATHY KATCHER has
developed a significant relationship with the child;

 

6.       The
Court finds that KATHY KATCHER has
invested significant time raising and caring for the child; 

 

7.       The
Court finds that KATHY KATCHER and TAMMY FOUNTAIN have both had the care,
control and possession of the child for a period of 6 months not ending 90 days
prior to the filing of KATHY KATCHER’S Original
Suit Affecting Parent Child Relationship; and

 

8.       The
Court finds that it is in the child’s best interest for KATHY KATCHER to be able to proceed with her Original Suit
Affecting Parent Child Relationship.

 

Fountain
appealed the associate judge’s ruling to the trial court.  After a de novo hearing, including four days
of testimony and argument, the trial court orally adopted the associate judge’s
ruling on December 28, 2010.  It is this
ruling that Fountain challenges in her petition for mandamus.[5]

Analysis

I.       Standard
of review

          Mandamus
relief is available if the relator establishes a clear abuse of discretion for
which there is no adequate remedy at law. 
In re AutoNation, Inc., 228
S.W.3d 663, 667 (Tex. 2007) (orig. proceeding). 
A trial court has no discretion in determining what the law is or
applying the law to the facts.  Walker v. Packer, 827 S.W.2d 833, 840
(Tex. 1992) (orig. proceeding).  If the
trial court fails to analyze or apply the law correctly, the trial court abuses
its discretion.  Id.  With respect to the
resolution of factual issues, however, the reviewing court may not substitute
its judgment for that of the trial court. 
Id. at 839.  The relator must establish that the trial
court could have reasonably reached only one conclusion.  Id. at
840.  

II.      Standing

          Standing, which is implicit
in the concept of subject-matter jurisdiction, is a threshold issue in a child
custody proceeding.  See In re SSJ-J, 153 S.W.3d 132, 134 (Tex. App.—San Antonio 2004,
no pet.); see also Tex Ass’n of Bus. v.
Tex. Air Control Bd., 852 S.W.2d 440, 443-44 (Tex. 1993). 
Whether a party
has standing to pursue a cause of action is a question of law.  See SSJ-J, 153 S.W.3d at 134.  In our
de novo review of the trial court’s determination of standing, we must take as
true all evidence favorable to the challenged party and indulge every
reasonable inference and resolve any doubts in the challenged party’s favor.  See Tex.
Dep’t of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 228 (Tex. 2004); Hobbs v. Van Stavern, 249 S.W.3d 1, 3
(Tex. App.—Houston [1st Dist.] 2006, pet. denied); Smith v. Hawkins, No.
01-09-00060-CV, 2010 WL 3718546, at *3 (Tex. App.—Houston [1st Dist.] Sept. 23,
2010, no pet. h.) (memo. op.).

          When standing to bring a particular
type of lawsuit has been conferred by statute, we use that statutory framework
to analyze whether the petition has been filed by a proper party.  See Hunt
v. Bass, 664 S.W.2d 323, 324 (Tex. 1984); Atty. Gen. of Tex. v. Crawford, 322 S.W.3d 858, 862 (Tex. App.—Houston
[1st Dist.] 2010, pet. filed).  In an
original suit affecting the parent-child relationship, the Texas Family Code
governs the standing question. 
Section 102.003(a)(9) grants standing to “a person, other than a
foster parent, who has had actual care, control, and possession of the child
for at least six months ending not more than 90 days preceding the date of the
filing of the petition.”  Tex. Fam. Code Ann. § 102.003(a)(9)
(West 2008).  A determination of standing
under section 102.003(a)(9) is necessarily fact specific and determined on
a case-by-case basis.  See In
re M.P.B., 257 S.W.3d 804, 808-09 (Tex. App.—Dallas 2008, no
pet.).  In computing the time necessary
for statutory standing, “the court may not require that the time be continuous
and uninterrupted but shall consider the child’s principal residence during the
relevant time preceding the date of commencement of the suit.”  Tex.
Fam. Code Ann. § 102.003(b) (West 2008).

          Fountain
is S.J.F.’s only legal parent.  She thus
contends that Katcher, as a non-parent, lacks standing under section 102.003(a)(9) to seek appointment as sole managing
conservator of S.J.F. absent any evidence that the legal parent abdicated her
parental responsibility to care for the child, and in the absence of any legal
document evidencing the parties’ intention to share parenting responsibilities.  Fountain’s argument relies upon cases
suggesting that for purposes of the standing determination, a parent and a
non-parent cannot both exercise actual care, control, and possession of a child
at the same time without the consent of a parent.[6]  That notion, however, reads into the statute
additional requirements not imposed by the Legislature.  To the contrary, this Court and others have
previously held that “[n]othing in section 102.003(a)(9) requires that care,
custody, control and possession be exclusive.” 
Smith, 2010 WL 3718546, at *3
(rejecting father’s challenge to standing of aunt who consistently exercised
care, custody, control, and possession along with grandmother who had
previously been named managing conservator of child);[7] see also M.P.B., 257
S.W.3d at 809 (rejecting father’s challenge to standing of grandmother who had
been consistently and significantly involved in raising child along with
child’s deceased mother over substantial period of time); In re J.J.J., No. 14-08-01015-CV, 2009 WL 4613715, at *2 (Tex.
App.—Houston [14th Dist.] Dec. 8, 2009, no pet.) (mem. op.).  

In the absence of any requirement
that a person with standing exercise exclusive care, control, or possession, the
question of Katcher’s statutory standing hinges on whether she exercised “actual”
care, control, or possession of the child. 
Taking as true
all evidence favorable to Katcher, and indulging every reasonable inference and
resolving any doubts in her favor, we conclude that statutory standard was satisfied. 
The trial court was presented
with evidence that, although Katcher’s care, control, and possession of S.J.F.
was not exclusive, she provided the child with a place to sleep, food,
clothing, toys, and medicine.  Both women
cared for him most nights.  Katcher made
improvements to both women’s homes to make them suitable for a small child.  She participated in important decisions
related to S.J.F.’s welfare, including attending medical appointments and
providing for his daycare.  Viewed as a
whole, the evidence does not suggest that, prior to the dissolution of the
relationship, Katcher’s pattern of care and possession was intended to be
temporary.  Fountain testified that
Katcher possessed and cared for S.J.F. at times during their relationship, and
she even discussed with a lawyer the possibility of Katcher adopting the child.  Therefore, the trial court could reasonably
conclude that the women shared parenting responsibilities, including the “actual
care, control, and possession” of S.J.F., until their separation in April 2010.

On this record, the trial court did
not clearly abuse its discretion in concluding that, for purposes of the
statute, Katcher is a person, other than a foster parent, who had actual care,
control, and possession of S.J.F. for at least six months ending not more than
90 days preceding the date of the filing of her petition to establish a
managing conservatorship.  See Tex.
Fam. Code Ann. § 102.003(a)(9).[8]

III.    Fundamental
parental rights

          In
addition to her statutory interpretation argument that Katcher lacks standing,
Fountain’s mandamus petition also referred to interference with her constitutional
right to parent her child as she desires. 
The petition stated that “[t]he interest of parents in the ‘care,
custody, and control’ of their children ‘is perhaps the oldest of the
fundamental libery interests’ recognized by the United States Supreme Court in
cases like Troxel v. Granville,” that
“[t]he natural right existing between parents and their children is one of
constitutional dimensions,” and that a parent’s interests “are a fundamental
right protected by the Due Process Clause of the Fourteenth Amendment to the
United States Constitution.”  But apart
from reciting these principles of constitutional law, Fountain’s initial
petition to this Court presented no actual argument or authorities to the
effect that Family Code section 102.003(a)(9) is unconstitutional, either
on its face or as applied to her in these circumstances.  Our review of the record does not reflect
that any such argument was presented in the trial court either.[9]

In her motion for en banc reconsideration,
Fountain again references Troxel and
suggests that section 102.003(a)(9) is unconstitutional.  That issue is inadequately briefed.  See Tex. R. App. P. 52.3(h); Wheeler v. Methodist Hosp., 95 S.W.3d
628, 646 (Tex. App.—Houston [1st Dist.] 2002, no pet.).  However, we observe that the primary problem identified
by the plurality in Troxel was that
the Washington statute at issue permitted “any person” to petition a court for
visitation rights at “any time,” and the statute authorized a court to grant
such visitation rights whenever “visitation may serve the best interest of the
child.”  Troxel v. Granville, 530 U.S. 57, 60, 120 S. Ct. 2054, 2057 (2000) (plurality
op.).  The United States Supreme Court held
the statute offended principles of due process, noting that the statute was
“breathtakingly broad” and accorded
no deference to a fit parent’s decision. 
Id. at 67, 120 S. Ct. at 2061.  Those circumstances are not presented here,
when the Legislature has provided a restricted and considerably more tailored
standard for standing than “any person.”[10]
 Moreover, although the mere fact of the
filing of this suit constitutes at least some degree of intrusion “into the
private realm of the family,” which ordinarily should not be disturbed by the
state “so long as a parent adequately cares for his or her children (i.e., is fit),” id. at 68, 120 S. Ct. at 2061, with respect to further proceedings
Fountain still enjoys the protection of a statutory presumption that she, as
the only parent, should be appointed sole managing conservator.  Tex.
Fam. Code Ann. § 153.131(a) (West 2008) (applying presumption
“unless the court finds that the appointment of the parent or parents would not
be in the best interest of the child because the appointment would
significantly impair the child’s physical health or emotional development.”).[11]  The Texas Supreme Court has characterized language
similar to that contained in this presumption as a “high threshold” that
represents an implementation of Troxel’s
holding.  See In re Derzapf, 219 S.W.3d 327, 333-34 (Tex.
2007) (analyzing grandparent access statute, Tex.
Fam. Code Ann. § 153.433(a)).

Fountain has provided no argument to explain why, despite these distinctions,
we should invalidate the Texas statute on the authority of Troxel, or under what legal standard we should even consider doing
so.  See,
e.g., Troxel, 530 U.S. at 80, 120
S. Ct. at 2068 (Thomas, J., concurring) (observing that Troxel plurality opinion and separate opinions of Justices Kennedy
and Souter did not articulate appropriate standard of review for evaluating
whether statute impinges on fundamental right of parents to direct upbringing
of their children); In re Mays-Hooper, 189 S.W.3d 777, 778 (Tex. 2006). 
In the absence of adequate legal briefing and any coercion by the trial
court, we decline to do so.  To be clear,
we express no opinion about whether the trial court would have abused its
discretion by granting temporary visitation to Katcher absent Fountain’s
agreement to the terms on a temporary basis.

Conclusion

          We hold
that the trial court did not clearly abuse its discretion in denying Fountain’s
motion to dismiss the underlying suit or in entering agreed temporary orders
affording Katcher visitation with S.J.F. 
Accordingly, Fountain’s petition for writ of mandamus is denied.

 

 

Michael Massengale

                                                                   Justice


 

Panel consists of Justices Keyes, Massengale, and
Brown.











[1]          See Tex.
Dep’t of Parks & Wildlife v. Miranda,
133 S.W.3d 217, 228 (Tex. 2004); Hobbs v.
Van Stavern, 249 S.W.3d 1, 3 (Tex. App.—Houston [1st Dist.] 2006, pet.
denied); Smith v. Hawkins, No. 01-09-00060-CV, 2010 WL 3718546, at *3
(Tex. App.—Houston [1st Dist.] Sept. 23, 2010, no pet. h.) (memo. op.); In re M.J.G., 248 S.W.3d 753, 758 (Tex.
App.—Fort Worth 2008, no pet.).

 





[2]          According to Fountain, there was no agreement to add
Katcher as an adoptive parent.  Fountain
denies that the two women intended to co-parent or share periods of possession
and access to S.J.F.

 





[3]          In contrast, Fountain maintains that her home was
S.J.F.’s primary residence.  She
acknowledges that, prior to the adoption, S.J.F. spent equal amounts of time in
the two women’s homes.  But she testified
that she provided S.J.F.’s health insurance and made all decisions concerning
his welfare.  She also testified that she
took S.J.F. to and from daycare 90 percent of the time, but that on
occasion Katcher would either take S.J.F. to daycare or care for him at home
while Fountain worked.  Although Fountain
conceded that the two women cared for S.J.F. together for a period of time and
that Katcher paid the majority of S.J.F.’s daycare expenses, she characterized
Katcher’s role in S.J.F.’s life as that of a “fun-loving aunt.”

 





[4]
          Fountain
testified that she and Katcher separated on 20 to 25 occasions and declined to
characterize their relationship as serious. 
Fountain blamed the problems in their relationship on Katcher’s drug
use.  Katcher disputes the allegations of
drug use and recalled only two breakups.

 





[5]
          Fountain
did not immediately challenge the trial court’s denial of her motion to
dismiss.  Instead, at the trial court’s
suggestion, the parties participated in mediation.  At mediation, the parties entered into
“Mediated Settlement Agreement Temporary Orders,” which granted Katcher
temporary possession of and access to S.J.F. on specified dates and times
during the pendency of the underlying suit. 
The agreement recited that “[e]ach signatory to this settlement has
entered into same freely and without duress after having consulted with
professionals of his or her choice.” 
Fountain and her counsel each signed the agreement.  Fountain initialed each page, and she
separately initialed a sentence set apart on the first page of the agreement,
stating in boldfaced, underlined, and all-capital letters that “A PARTY TO
THIS AGREEMENT IS ENTITLED TO JUDGMENT ON THIS MEDIATED SETTLEMENT AGREEMENT.”  The agreement also stated that it did not
“prejudice or waive the right of the parties to pursue a mandamus or an appeal
to a higher court.”  The trial court
entered temporary orders granting Katcher visitation with S.J.F in accordance
with the terms of the mediated agreement.

 

          Because Fountain agreed
to the entry of temporary orders, we do not consider that order within the
proper scope of her challenge in this original proceeding.  A party can hardly complain that a trial
court committed a clear abuse of discretion by implementing a temporary order after
agreeing to the terms and entry of the order. 
Despite the trial court’s ruling on the standing question and the
referral to mediation, we have no record to indicate that the trial court would
have awarded temporary access to the child absent Fountain’s consent to the
terms.





[6]          See In re K.K.C., 292 S.W.3d 788, 793 (Tex. App.—Beaumont 2010, orig. proceeding)
(rejecting standing of person who cohabited with parent and participated in supporting
child, yet “had no legal right of control over the child and no authority to
make decisions on behalf of the child”); M.J.G.,
248 S.W.3d at 758-59 (affirming rejection of
grandparents’ standing, even though children lived in their home and they “performed
day-to-day caretaking duties for the children,” because “parents were also
living with the children in the home,” there was no evidence that parents “did
not also care for the children,” or that parents “had abdicated their parental
duties and responsibilities to the grandparents”).

 





[7]          On rehearing, Fountain
contends that the Court’s prior opinion in Smith,
2010 WL 3718546, at *3, cannot support the denial of mandamus relief in this
case.  Specifically, Fountain asserts
that Smith must be distinguished
because, unlike the parents there, she has not abdicated her parental rights
over S.J.F.  Smith involved an aunt who intervened to seek modification of the
conservatorship of her nephew, and her standing was accepted by the trial court
and affirmed on appeal.  The aunt shared
a household with the child’s grandmother, who was the child’s managing conservator.  2010 WL 3718546, at *1.  The child’s
biological parents were possessory conservators.  Id.  The following facts were relevant to the
Court’s standing analysis:  (1) the aunt
used her income to provide for the child, including payments for the child’s
heath insurance and the mortgage for the home in which the child resided; (2) the aunt had been involved in the child’s
life consistently for a substantial period of time; (3) the child considered the aunt a mother; (4) the child’s biological mother testified that
the aunt was a wonderful parent; (5) the aunt was involved in the child’s education; and (6) the aunt purchased the child’s clothing.  Id. at
*3-4.  The biological parents’ abdication of their
own responsibilities for the child was not a determinative factor in the
conclusion that the aunt had standing.  See id. 
Instead, the opinion noted that the person charged with parenting
the child, his grandmother, had shared that responsibility with the aunt.  Id.  While we agree that the fact pattern
involving Fountain and Katcher is different in important respects, we see no
reason why the result in Smith
requires us to grant relief in favor of Fountain in this original proceeding.

 





[8]          Because Fountain’s objection to standing is her only proper
challenge to the trial court’s temporary order, the entry of that agreed order
will not separately support mandamus relief. 
See supra note 5.

 





[9]          In this respect Fountain’s petition is distinguishable
from the Texas Supreme Court’s decision in In
re Mays-Hooper, 189 S.W.3d 777 (Tex. 2006), in which a challenge to Family
Code § 153.432 had been presented to and was
rejected by the trial court.  See 189
S.W.3d at 777.

 





[10]
        Family
Code § 102.003(a) describes the general parameters of who has general standing
to file a suit affecting the parent-child relationship, and provides that an
original suit “may be filed at any time by:

 

(1) a parent of the child;

 

(2) the child through a representative
authorized by the court;

 

(3) a custodian or person having the right
of visitation with or access to the child appointed by an order of a court of
another state or country;

 

(4) a guardian of the person or of the
estate of the child;

 

(5) a governmental entity;

 

(6) an authorized agency;

 

(7) a licensed child placing agency;

 

(8) a man alleging himself to be the father
of a child filing in accordance with Chapter 160, subject to the limitations of
that chapter, but not otherwise;

 

(9) a person, other than a foster parent,
who has had actual care, control, and possession of the child for at least six
months ending not more than 90 days preceding the date of the filing of the
petition;

 

(10) a person designated as the managing
conservator in a revoked or unrevoked affidavit of relinquishment under
Chapter 161 or to whom consent to adoption has been given in writing under
Chapter 162;

 

(11) a person with whom the child and the
child’s guardian, managing conservator, or parent have resided for at least six
months ending not more than 90 days preceding the date of the filing of the
petition if the child’s guardian, managing conservator, or parent is deceased
at the time of the filing of the petition;

 

(12) a person who is the foster parent of a
child placed by the Department of Protective and Regulatory Services in the person’s
home for at least 12 months ending not more than 90 days preceding the
date of the filing of the petition;

 

(13) a person who is a relative of the
child within the third degree by consanguinity, as determined by Chapter 573,
Government Code, if the child’s parents are deceased at the time of the filing
of the petition; or

 

(14) a person who has been named as a
prospective adoptive parent of a child by a pregnant woman or the parent of the
child, in a verified written statement to confer standing executed under
Section 102.0035, regardless of whether the child has been born.”



Tex. Fam. Code Ann. § 102.003(a) (West 2008).

 





[11]         We note in particular that the Troxel plurality specifically stated that the problem in that case
was not that the Washington court intervened, but that when it did so it gave
no special weight to the legal parents’ determination of the children’s best
interests.  Troxel v. Granville, 530 U.S. 57, 69, 120 S. Ct. 2054, 2062 (2000)
(plurality op.).