Opinion issued May 24, 2007







 






In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00210-CV






CHRISTUS HEALTH/ST. JOSEPH HOSPITAL, Appellant


V.


ANGELA PRICE, Appellee






On Appeal from the 268th District Court

Fort Bend County, Texas

Trial Court Cause No. 01-CV-121459






MEMORANDUM OPINION ON REHEARING

 We issued an opinion in this case on February 1, 2007. Appellant, Christus
Health/St. Joseph Hospital moved for a rehearing. (1) We grant rehearing, withdraw our
opinion and vacate our judgment of February 1, 2007, and issue this opinion in its
stead.

 Appellant, Christus Health/St. Joseph Hospital, appeals a judgment in favor of
appellee, Angela Price, that was entered in accordance with the jury's verdict. The 
hospital sued Price to attempt to reverse a determination by the Texas Workers'
Compensation Commission (TWCC), which had found that Price sustained a
compensable injury in the course and scope of her employment with the hospital. The
sole issue submitted to the jury was whether Price had received a compensable injury. 
The jury agreed with the determination by the TWCC. The trial court rendered
judgment that the hospital take nothing in its suit against Price and awarded Price her
attorney's fees and costs for trial and appellate attorney's fees in the event of an
unsuccessful appeal by the hospital. In three issues, the hospital contends that (1) the
trial court erred by excluding medical records obtained by a deposition on written
questions, (2) the trial court erred by allowing Price's expert witness to testify, and
(3) the evidence was legally and factually insufficient to support the jury's verdict
that Price sustained a compensable injury. We conclude that the hospital failed to
preserve for appeal its challenges to the legal and factual sufficiency of the evidence. 
We also conclude that the trial court did not err by allowing Price's expert to testify. 
We further conclude that, assuming the trial court erred by excluding the deposition
on written questions, the error was harmless. We affirm the judgment of the trial
court.

Background

 On June 30, 1994, Price was working as a certified nursing assistant for the
hospital. While attempting to draw blood from a patient with human
immunodeficiency virus (HIV) who had developed Acquired Immune Deficiency
Syndrome (AIDS), Price was stuck in her finger by a needle she had used on the
patient. Price immediately reported the needle stick to her supervisors and went to
the hospital's emergency room. Price tested negative for HIV on the date of the
incident. In accordance with the hospital's protocol after an employee was exposed
to HIV, Price was tested several times over the following months. Price tested
negative for HIV in August 1994, which was 30 days after she was stuck by the
needle, December 1994, which was 6 months after she was stuck, and April 1995,
which was 10 months after she was stuck. According to the hospital, 17 months after
Price was stuck, she again tested negative for HIV.

 In December 1998, over four years after getting stuck by the needle, as part of
a physical examination while applying for life insurance, Price tested positive for
HIV. Price filed a claim for worker's compensation benefits, alleging that she
contracted HIV from the needle stick. The hospital denied her claim. After a
contested case hearing before the TWCC, the hearing officer found that the needle
stick was a compensable injury that Price incurred on June 30, 1994, in the course and
scope of her employment for the hospital. The hospital appealed the hearing officer's
decision to an appellate panel of the TWCC, which affirmed the decision of the
hearing officer. To challenge the TWCC's determination that the hospital was liable
for Price's injury, the hospital filed this suit, seeking judicial review of the TWCC's
determination.

 At trial, Elaine Whittingon, a nurse employed by the hospital, testified that
according to the hospital's records, Price was stuck by a needle that had been used on
a patient infected with HIV. Price also described how she was stuck by the needle. 
Price further testified that, after the HIV tests performed by the hospital, she was not
tested again until the December 1998 test for life insurance. Price specifically denied
being tested for HIV by Dr. Meredith in November 1995. The hospital offered into
evidence the deposition on written questions propounded to Dr. Meredith on various
grounds, including to impeach the testimony of Price, but Price objected to the
medical records on the grounds that they were business records that had not been on
file with the court for more than 14 days before trial. The trial court refused to admit
the evidence. The excluded records indicate that Price tested negative for HIV at the
test taken 17 months after she was stuck by the needle.

 Three medical experts testified at trial. Dr. Seibert, an infectious disease
physician employed by the hospital, and Dr. Septimus, the medical director of the
infectious disease and employee health departments for Memorial Hermann
Healthcare Systems, testified as experts for the hospital. Dr. Seibert testified that
.003% of healthcare workers that "get a needle stick from an HIV positive patient get
HIV." He explained that out of this .003 that actually get HIV, "in excess of 99%"
of them test positive to the ELISA test within six months." (2) Dr. Septimus testified
similarly that "if you look at medical literature and the tracking that the Centers for
Disease Control does, virtually all employees that have had transmissions of HIV
from needle sticks will develop antibodies by six month[s]." Dr. Septimus said that
the negative six month test "virtually excluded the possibility" that Price got HIV
from the needle stick, "except for some rare exceptions."

 In addition to the negative six month test for HIV, Price also tested negative
for HIV ten months after she was stuck by the needle. Drs. Seibert and Septimus
testified that the ten month test increased their level of confidence to above 99% that
the needle stick at the hospital did not cause Price's HIV. Dr. Septimus testified that
the additional negative result at ten months, following the negative HIV test at six
months, "raises the confidence up to ninety-nine plus percent" that the needle stick
was not the cause of the HIV.

 The jury also heard Drs. Seibert and Septimus testify hypothetically that if
someone who was stuck by a needle that was used on an HIV infected patient, and
that person tested negative for HIV at six months, at 10 months, and at 17 months, the
results from the 17 months test would "add additional evidence" that the person was
not infected by the needle. Dr. Seibert said that he has never seen a single reported
case in medical science of a person who tested negative at 17 months and then got
HIV.

 Price's treating physician, Dr. Salvato, also testified. Dr. Salvato is board
certified in internal medicine and specializes in treating patients with HIV and AIDS. 
She is a member of the American Academy of HIV Specialists. Dr. Salvato explained
that one measure of progression of HIV and AIDS is the patient's T-cell count. In the
"great majority" of patients, the T-cell count declines at a certain rate. Dr. Salvato
testified that Price's T-cell count progression was consistent with her contracting HIV
from the 1994 needle stick. Additionally, in contradiction of the opinions of Dr.
Seibert and Dr. Septimus, Dr. Salvato testified that reliable medical evidence exists
that a person can be infected with HIV and not test positive for it for extended periods
of time. In particular, Dr. Salvato referred to her own experience and observations,
a New England Journal of Medicine article, and information from the International
Conference on AIDS. Dr. Salvato stated that, in reasonable medical probability, Price
contracted HIV from the needle stick in 1994.

Sufficiency of the Evidence

 In its third issue, the hospital contends that the evidence is legally and factually
insufficient to support the jury's verdict that the needle stick was a compensable
injury. Specifically, the hospital contends that "Dr. Salvato's testimony does not meet
the requirements for expert testimony and is no evidence and/or insufficient evidence
to support" the jury's verdict. Because this was an appeal from a TWCC
determination, the hospital bore the burden of proving, by a preponderance of the
evidence, that Price did not receive a compensable injury. (3) See Tex. Lab. Code Ann.
§§ 410.301(a), 410.303 (Vernon 2006).

 As a preliminary matter, we review the record to determine whether the
hospital preserved error. To preserve for appeal a complaint of legal insufficiency of
the evidence, a party must have specifically raised its complaint in (1) a motion for
instructed verdict, (2) an objection to the submission of a jury question, (3) a motion
for judgment notwithstanding the verdict, (4) a motion to disregard the jury's answer
to a vital fact question, or (5) a motion for new trial. Cecil v. Smith, 804 S.W.2d 509,
510-11 (Tex. 1991); U.S.A. Precision Machining Co. v. Marshall, 95 S.W.3d 407,
411 (Tex. App.--Houston [1st Dist.] 2002, pet. denied). Here, the hospital did not
move for an instructed verdict. The hospital did not object to the submission of a jury
question. (4) The hospital did not move for judgment notwithstanding the verdict or to
have the trial court disregard the jury's answer to a vital fact question. The hospital
did move for a new trial. However, the motion for new trial does not complain about
the legal sufficiency of the evidence to support the jury's verdict. Accordingly, we
conclude that the hospital has not preserved the issue of the legal sufficiency of the
evidence. 

 With respect to the factual-sufficiency complaint, Rule 324 of the Texas Rules
of Civil Procedure, "Prerequisites of Appeal," provides,

 (a) Motion for New Trial Not Required. A point in a motion for
new trial is not a prerequisite to a complaint on appeal in either a
jury or a nonjury case, except as provided in subdivision (b).


 (b) Motion for New Trial Required. A point in a motion for new
trial is a prerequisite to the following complaints on appeal:


 . . .


 (2) A complaint of factual insufficiency of the evidence to
support a jury finding;


 . . . .


Tex. R. Civ. P. 324. The hospital's motion for new trial did not raise the issue of
factual insufficiency of the evidence. Accordingly, we conclude that the hospital's
factual-sufficiency complaint has not been preserved. See Marshall, 95 S.W.3d at
411-12.

 We overrule the hospital's third issue.

Admission of Expert Opinion Testimony

 In its second issue, the hospital contends that the trial court erred by allowing
Price's expert, Dr. Salvato, to offer her opinion of causation to the jury. Specifically,
the hospital asserts that Dr. Salvato's opinion was unreliable because

 (1) Dr. Salvato's opinion that [Price] and her pattern of HIV illness
matched a health care worker who had gotten the virus from a needle
stick as reported in a Center for Disease Control (CDR) [sic] article was
erroneous; (2) the article from the New England Journal of Medicine,
Defendant's Exhibit 3, which Dr. Salvato relied on in basing her opinion
that the June 30, 1994 needle stick was the cause of [Price's] HIV status
was based on highly variable T-cell progression rates; (3) Dr. Salvato
opined in prior affidavits that it was only possible that [Price] had been
affected by the 1994 needle stick; and (4) Dr. Salvato exclusively relied
upon [Price's] subjective complaints in forming her opinion on
causation.


Price responds that the hospital's challenges concern "the unreliability of Dr.
Salvato's conclusions," and not "the underlying methodology on which Dr. Salvato
based her conclusions."

 The trial court has broad discretion in determining whether an expert's
testimony is reliable and admissible. (5) Keo v. Vu, 76 S.W.3d 725, 730 (Tex.
App.--Houston [1st Dist.] 2002, pet. denied) (citing E.I. du Pont de Nemours & Co.
v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995)). The trial court abuses its discretion
if it acts without reference to any guiding rules or principles. Id. If expert testimony
is not reliable, it is not admissible. Brookshire Bros. v. Smith, 176 S.W.3d 30, 36
(Tex. App.--Houston [1st Dist.] 2004, pet. denied) (citing Merrell Dow Pharm., Inc.
v. Havner, 953 S.W.2d 706, 712-13 (Tex. 1997) and Coastal Tankships, U.S.A., Inc.
v. Anderson, 87 S.W.3d 591, 610 (Tex. App.--Houston [1st Dist.] 2002, pet.
denied)). To determine reliability, the court may consider the following
non-exclusive factors: (1) the extent to which the expert's theory has been or can be
tested, (2) the extent to which the technique relies upon the expert's own subjective
interpretation, (3) whether the expert's theory has been subjected to peer review and
publication, (4) the potential rate of error of the theory, (5) whether the expert's
theory or technique has been generally accepted as valid by the relevant scientific
community, and (6) the non-judicial uses that have been made of the expert's theory
or technique. Keo, 76 S.W.3d at 734 (citing Gammill v. Jack Williams Chevrolet,
Inc., 972 S.W.2d 713, 720 (Tex. 1998)). "The trial court is not to determine whether
the expert's conclusions are correct, but only whether the analysis used to reach them
is reliable." Id. (citing Gammill, 972 S.W.2d at 728). If an expert's opinion is shaky
or is based on a weak factual foundation, this does not necessarily render the opinion
inadmissible because cross-examination is "the traditional and appropriate means of
attacking shaky but admissible evidence." Gammill, 972 S.W.2d at 728 (quoting
Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596, 113 S. Ct. 2786, 2798
(1993)); see also Keo, 76 S.W.3d at 734-35 (stating that alleged unreliability of
doctor's expert opinion because it was based on self-serving statements of plaintiff
went "to the weight, rather than the admissibility, of the evidence"). 

 Dr. Salvato opined that, in reasonable medical probability, Price was infected
with HIV by the needle stick in 1994. Dr. Salvato's primary practice is the treatment
of patients with HIV and AIDS. Dr. Salvato testified that she was Price's primary
care physician and had been for six years. Dr. Salvato testified that she based her
opinion on the medical history Price gave to her in the course of their six-year doctor-patient relationship; the progression of Price's T-cell count; medical articles
regarding the progression of HIV and AIDS, including the period of time for which
persons can be infected before seroconversion; and her own experience and education
regarding HIV infection.

 The hospital contends that Dr. Salvato's reliance on a New England Journal of
Medicine article from 1989 shows that her testimony that a person may be infected
and remain seronegative for long periods of time is unreliable. The article describes
31 patients who were infected with HIV. However, 27 of the 31 patients remained
seronegative for up to 36 months. The hospital contends that because the study was
based on homosexual men, it is distinguishable from Price's case. The hospital also
points out that Dr. Salvato admitted that this study did not disturb conventional
thinking that 95% of persons infected with HIV test positive on an antibody test
within six months. However, the hospital does not explain the significance of the
gender or sexual orientation of an HIV positive patient. Dr. Salvato testified, "It
doesn't matter how you get the virus, the virus is the same. . . . So if she got the virus
by needle stick or she got it by blood transfusion or IV drug use, the AIDS virus is
the AIDS virus, we can't say that it's going to progress differently in her than a
homosexual male." We cannot conclude that the trial court abused its discretion by
admitting the testimony of Dr. Salvato, a medical doctor with extensive experience
treating patients with HIV, including this patient, and whose opinion was supported
by peer-reviewed medical literature.

 Even if the trial court abused its discretion in admitting Dr. Salvato's
testimony, we note that any purported error must be harmful--here, that admitting Dr.
Salvato's testimony "probably did cause, 'rendition of an improper judgment.'" 
Benavides v. Cushman, Inc., 189 S.W.3d 875, 79 (Tex. App.--Houston [1st Dist.]
2006, no pet.) (quoting Tex. R. App. P. 44.1(a)(1) and Owens-Corning Fiberglas
Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998)). The hospital contends that the
error was harmful because "[t]here was no other evidence [Price] relied upon in
proving causation" and "the remaining competent evidence was insufficient to
support the judgment." 

 Even without Dr. Salvato's testimony, we conclude that the remaining
testimony is sufficient to support the jury's verdict. See GTE Sw., Inc. v. Bruce, 998
S.W.2d 605, 620 (Tex. 1999) (concluding that error in admitting expert testimony
was harmless because other testimony was sufficient to support jury's verdict). The
jury may accept or reject the testimony of any witness, including an expert's opinion
testimony. See City of Keller v. Wilson, 168 S.W.3d 802, 819-20 (Tex. 2005); see
also Bruce, 998 S.W.2d at 620 ("'Jurors realize that they are the final triers to decide
the issues. They may accept or reject an expert's view.'") (quoting Louder v. De
Leon, 754 S.W.2d 148, 149 (Tex. 1988)).

 First, in this suit seeking to reverse a TWCC decision in Price's favor, the
burden was on the hospital to persuade the jury that the needle stick did not cause
Price's HIV infection, not on Price to establish that it did. See Tex. Lab. Code Ann.
§ 410.303. Although Dr. Seibert opined that Price did not contract HIV from the
needle stick, he nonetheless testified that seroconversion nine months after infection
was possible, but "very rare." Further, Dr. Seibert and Dr. Septimus testified
regarding the most common methods of HIV infection. They stated that the most
common methods of transmission for HIV are (1) mother to fetus; (2) sexual 
transmission (the highest risk in this category is male-to-male sexual activity); and 
(3) blood-borne transmission (which includes needle sticks and IV drug use). It is
undisputed that Price's infection was not a result of mother-to-fetus transmission or
male-to-male sexual transmission. Price testified that she was not an IV drug user
and that she had not been exposed to sexual transmission of HIV. She also stated that 
her only exposure to HIV infection was the needle stick in 1994.

 The hospital had the burden to prove by a preponderance of the evidence that
Price was not infected with HIV by the 1994 needle stick. The jurors could choose
to believe Price's testimony and reject in part the testimony from the hospital's
experts. Further, the record contains no evidence that anything other than the needle
stick caused Price's HIV, a method of transmission that the hospital's experts
acknowledged as a common method of transmission of the virus. Accordingly, we
conclude that the hospital has not shown that it was harmed by the admission of Dr.
Salvato's testimony. See Bruce, 998 S.W.2d at 620.

 We overrule the hospital's second issue.

Exclusion of Medical Records


 In its first issue, the hospital asserts that the trial court erred by excluding
medical records obtained by a deposition on written questions of Dr. Meredith, which
purportedly show that in November 1995, approximately 17 months after the needle
stick, an HIV screening performed on Price was negative. On appeal, the hospital
observes that the trial court erred because the 14-day filing requirement applies only
to affidavits from a custodian of the records, not to records obtained through a
deposition on written questions. The hospital further asserts that the exclusion of
these records was harmful error because the doctors who testified at trial stated that
a negative HIV test performed 17 months after exposure would raise their confidence
in concluding that the exposure did not result in the person contracting HIV and
because "no other evidence adduced at trial . . . reflected a negative HIV test
performed seventeen months post needle stick." The hospital also contends that the
exclusion was harmful because the jury inquired about the excluded medical records. 
Price responds that the error, if any, was harmless because the evidence was
cumulative and not controlling on a material issue dispositive of the case.

 "The admission and exclusion of evidence is committed to the trial court's
sound discretion." Benavides, 189 S.W.3d at 878-79 (citing City of Brownsville v.
Alvarado, 897 S.W.2d 750, 753 (Tex. 1995)). "To obtain reversal of a judgment
based on error in the admission or exclusion of evidence, an appellant must show that
the trial court's ruling was erroneous and that the error was calculated to cause, and
probably did cause, 'rendition of an improper judgment.'" Benavides, 189 S.W.3d
at 879 (quoting Tex. R. App. P. 44.1(a)(1) and Owens-Corning, 972 S.W.2d at 43). 
In conducting this harm analysis, we review the entire record. Tex. Dep't of Transp.
v. Able, 35 S.W.3d 608, 617 (Tex. 2000); Alvarado, 897 S.W.2d at 754; Benavides,
189 S.W.3d at 879. Evidentiary rulings do not usually cause reversible error unless
the appellant can demonstrate that the judgment turns on the particular evidence that
was admitted or excluded. Able, 35 S.W.3d at 617; Alvarado, 897 S.W.2d at 753-54;
Benavides, 189 S.W.3d at 879. Reversal is required if the erroneously excluded
evidence "is both controlling on a material issue and not cumulative." Mentis v.
Barnard, 870 S.W.2d 14, 16 (Tex. 1994); see also Benavides, 189 S.W.3d at 880
(holding that there was no harm in excluding expert's testimony regarding incidents
similar to incident that injured plaintiff because jury heard evidence concerning other
incidents from other sources).

 Assuming the trial court erred by excluding the medical records, the error was
not harmful because (1) the jury heard testimony that indicated that Price had tested
negative for HIV at 17 months and (2) in view of the hospital's experts, a negative
HIV result at 17 months did not significantly alter their opinion that Price did not
contract HIV due to the needle stick. Rather, at most, it affected the doctors'
testimony by less than one percent, from a confidence level in their opinion of "over
99%" to a confidence level of "99.9%."

 Dr. Seibert testified that the HIV screening test performed on Price 17 months
after the needle stick was negative. (6) When this testimony was admitted, the trial court stated "Well, it's a document that has not been admitted into evidence, so its not
something he can testify to," and told the hospital's counsel, "You're going to have
to get this in, in accordance with the rules of evidence." The exclusion of the medical
records, however, did not cause the hospital's experts to be unable to give an opinion
about the consequences of a negative HIV test done 17 months after the needle stick
or change the experts' opinions based on the 10-month negative test, which had been
admitted into evidence. (7) Further, the exclusion of the records did not affect the
hospital's ability to present its theory at trial. For example, the hospital presented the
theory during voir dire. (8) The hospital also referred to the 17-month test in closing
argument. (9)

 The hospital contends that the harm caused by the exclusion of the evidence
is shown because the jury, during deliberations, asked about the excluded medical
records. The jury asked the following question:

 What is considered evidence, and more specifically what we may have
heard, as in the document that the plaintiff wanted to introduce as
evidence about her doctor visit and HIV test on Nov. 1995? Is this
evidence we can use since we heard it or we cannot since it was not
introduced?


The trial court's response was "Evidence introduced and admitted and testimony from
witness stand not objected to and objection not sustained is evidence." Dr. Seibert's
direct testimony that the 17-month HIV test was negative was objected to initially by
Price's counsel, but that objection was overruled. As the trial court instructed the jury
it was evidence because the "objection [was] not sustained." 

 More importantly, even if the evidence about the 17-month negative HIV test
was not before the jury, that evidence had little impact on the hospital's experts'
opinions. The hospital's experts testified that the negative HIV test done at six
months gave them a 95% confident opinion that Price's HIV was not a result of the
needle stick, and the negative HIV test done at 10 months gave them an "over 99%"
confident opinion that Price's HIV was not the result of the needle stick. A test at 17
months increased their confidence to "99.9%."

 We hold that even if the trial court improperly excluded Dr. Meredith's medical
records, the hospital has not shown that the error probably caused the rendition of an
improper judgment, as the experts who testified reached the same opinion that
Prices's onset of HIV four years later was too remote to relate to the needle stick at
the hospital--regardless of whether Price tested negative at only 10 months or at both
10 months and 17 months. See Tex. R. App. P. 44.1(a)(1); see Able, 35 S.W.3d at
617; Alvarado, 897 S.W.2d at 753-54; Benavides, 189 S.W.3d at 879.

 We overrule the hospital's first issue.


Conclusion

 We affirm the judgment of the trial court.

 

 Elsa Alcala

 Justice


Panel consists of Chief Justice Radack and Justices Alcala and Bland.
1. We requested a response from appellee, Angela Price, but she did not file one. 
2. The ELISA test is an HIV screening test. It tests for the presence of antibodies, not
for the presence of the virus. When a person contracts HIV, the virus itself is in the
body. However, there is a lag between the time HIV is contracted and the time that
the body makes antibodies to combat the virus. Thus, it is possible for a person to
have HIV, but not have the antibodies. In other words, a negative antibody test does
not necessarily rule out the presence of HIV. However, the antibody test gives very
few false negatives when antibodies are present. The change of an antibody test from
negative to positive, which indicates that the body has developed antibodies in
response to the infection, is called "seroconversion." A person who does not have the
antibodies is "seronegative"; a person who does is "seropositive." 
3. The jury was asked a single question:


 Do you find from a preponderance of the evidence that ANGELA
PRICE did not sustain a compensable injury, HIV (human
immunodeficiency virus), in the course and scope of her employment
with CHRISTUS HEALTH/ST. JOSEPH HOSPITAL on June 30,
1994?

 

 Answer: Yes, if she was "not injured"

 

 No, if she was "injured"

 

 The jury answered "no."
4. When the trial court presented the charge to the parties for a final review, the hospital
stated, "Plaintiff agrees, no objection."
5. To be admissible, an expert must also be qualified. See Keo v. Vu, 76 S.W.3d 725,
730 (Tex. App.--Houston [1st Dist.] 2002, pet. denied) (citing E.I. du Pont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995)). In this case, the
hospital has not challenged Dr. Salvato's qualifications. Dr. Salvato specializes in the
treatment of patients with HIV and AIDS. 
6. The record shows that Dr. Seibert testified as follows:


 [Hospital's counsel]: Have you had an opportunity to review any additional
HIV screening in Ms. Price's case?


 [Dr. Seibert]: I saw the one test that was done seventeen months
afterwards.


 [Hospital's counsel]: And what was the result of that test?


 [Dr. Seibert]: It was- 


 [Price's counsel]: Your Honor, I'm going to object, this is part of the body
of documents you have excluded.


 The Court: Overruled.


 [Dr. Seibert]: Could you--I'm sorry?


 [Hospital's counsel]: Sure. The question was--I forgot what the question
was-- 


 The Court: The court reporter can read it back for you.


 [Hospital's counsel]: Let me start over. Has it come to your awareness that
there was an additional HIV test in Ms. Price's case
before December of 1998?


 [Dr. Seibert]: Do you mean, did I--I learned of this additional test
recently. I didn't--don't think I knew it up until fairly
recently.


 [Hospital's counsel]: Okay. And what was the result of this test seventeen
months after the needle stick? 


 [Hospital's counsel]: It was positive--I'm sorry, it was negative.


 The Court: Well, it's a document that has not been admitted into
evidence, so its not something he can testify to.


 [Hospital's counsel]: But he has relied upon it, Your Honor. He has reviewed
it.


 The Court: I haven't heard any reliance upon it at all.


 [Hospital's counsel]: If--


 The Court: In fact, it's been pretty clear that he did not use that to
formulate his final report.


 [Hospital's counsel]: Your Honor, there are some special circumstances
surrounding this particular test.


 The Court: You're going to have to get this in, in accordance with
the rules of evidence.


 [Hospital's counsel]: Okay.


 [Hospital's counsel]: [Begins asking hypothetical involving 17 month test.]
7. The record shows that Dr. Seibert testified as follows:


 [Hospital's counsel]: I want you to assume with me, for purposes of a
hypothetical, that somebody has a needle stick event and
tests negative on day one, negative six weeks, negative
nine months, negative seventeen months, assuming those
facts to be true, what does that do to the probability that
HIV resulted from that needle stick?


 [Dr. Seibert]: Well, it makes--it makes it almost impossible.


 Dr. Septimus also testified about the consequences of a negative HIV test that was
performed 17 months after an exposure to HIV. Dr. Septimus stated the he had
"reviewed some records from Dr. Meredith," and stated that "[a]nother blood test was
done, I believe, by Dr. Meredith." Dr. Septimus thus did not specifically testify as to
the timing or the results of the test. However, Dr. Septimus stated that a negative test
at six months gave him 95% confidence that the exposure had not resulted in HIV
infection, that a ten-month test gave him 99% confidence, and that a 17 month test
"would virtually rule out" that the exposure resulted in infection and that "it would
be 99.9% that the transmission did not occur."
8. The hospital's counsel told the venire, "The evidence is further going to show that six
months after that, in November of '95, she had another negative HIV screening, so
more than 17 months post-event there was negative, negative, negative test."
9. The hospital's counsel argued, 


 It was like pulling teeth to get an answer to a simple question. And yet
on direct examination, she was lucid, she was clear, she was articulate,
very forthcoming with information. When I asked a question, I just go
blank stares, confusion. She denied that she was in Dr. Meredith's
office on November 21 of 1995 at 2:31 p.m. She denied that Dr.
Meredith took blood and sent it to a lab for an HIV test. That never
happened.


 Later the hospital argued to the jury about Dr. Seibert's testimony as follows:


 We asked Dr. Seibert, assuming we've got negative test on the day of
event, six weeks, six months, nine months, based upon that, every time
you repeat that test your confidence level goes up because it's a very
sensitive test, so every time you keep testing, if you keep getting the
same result, you're more and more confident with your findings. If she
was tested at 17 months by Dr. Meredith on November 21 of 1995,
what would that do to your confidence and your opinion, almost
certainty. The needle stick had nothing to do with the '98 HIV positive
status.


 Finally, regarding Dr. Septimus's testimony, the hospital asserted,


 And I asked [Dr. Septimus], here, "Have you become aware of the
possibility of another antibody test, what would that do to your opinion
that he expressed back in 2001, if - - if at 17 months there was another
negative antibody screen in addition to the four that we knew about, a
fifth one.["] It would make it almost absolute, that the needle stick had
nothing to do with the infection.