**Opinion issued July 2, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-01034-CV

———————————

### SHIRLEY LENOIR, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SHANA LENOIR AND CHRISTOPHER MCKNIGHT, INDIVIDUALLY AND AS NEXT FRIEND OF NAYLA MCKNIGHT, Appellants

### V.

### LEAH ANNE GONSKI MARINO F/K/A LEAH ANNE GONSKI AND JAOU-CHEN HUANG, M.D., Appellees

---

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2012-35806A

---

## OPINION ON REHEARING[1]

---

[1] We issued an opinion on November 25, 2014. The appellants and one appellee (Leah Anne Gonski Marino f/k/a Leah Anne Gonski) moved for rehearing; Gonski also moved

This health care liability case arises from the death of a UT Physicians (UTP) patient, Shana Lenoir, and her two unborn children hours after she received prenatal care at the UTP clinic. Suit was filed by Lenoir's mother, Shirley Lenoir, and the father of her only living child, Christopher McKnight, in their individual and representative capacities (collectively referred to as "the Lenoirs"). The Lenoirs sued the resident-physician and nurse who treated Shana, the attending physician, and the clinic.

Both doctors moved for dismissal of the claims against them, arguing that they were employees of governmental units, acting within the scope of that employment and, as a result, the election-of-remedies provision of the Texas Tort Claims Act mandated their dismissal. The trial court granted their motions and dismissed both physicians from the suit.

In three issues, the Lenoirs contend that neither physician was entitled to dismissal and challenge the affidavits submitted on the physicians' behalf as conclusory. We overrule the challenge to the affidavits, affirm the trial court's judgment dismissing Dr. Huang, reverse the portion of the judgment dismissing Dr. Gonski, and remand for further proceedings against Dr. Gonski.

for en banc reconsideration. We grant rehearing, withdraw our previous opinion and judgment, and substitute this opinion and judgment in their place. The disposition remains the same. We deny the motion for en banc reconsideration as moot. *See Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 33 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (op. on reh'g).

## Background

Shana Lenoir received prenatal care at the UTP clinic. Because the physician scheduled to see her was unavailable, she was seen by Dr. Gonski—a second-year medical resident. Shana told Dr. Gonski about complications with an earlier twin pregnancy that resulted in preterm delivery, the death of one twin, and lengthy hospitalization of the other. At the time Shana saw Dr. Gonski, she was between 32 and 35 weeks pregnant with twins. Dr. Gonski prescribed weekly injections of progesterone. A nurse gave Shana her first progesterone injection during the office visit. Several hours later, Shana began having difficulty breathing. Emergency medical assistance was called, but Shana and her unborn children died before they arrived at the hospital.

The Lenoirs sued the treating physician (Dr. Gonski), the attending physician overseeing Dr. Gonski (Dr. Huang), the nurse who injected the progesterone medication, and the UTP clinic.

Drs. Gonski and Huang moved for dismissal under Tort Claims Act section 101.106(f), arguing that the election-of-remedies provision of the Act mandated dismissal of the health care liability claims asserted against them. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f) (West 2011). Dr. Gonski alleged that she was an employee of the University of Texas System Medical Foundation, a nonprofit corporation that appoints medical residents to the UT Health Science

Center residency program, that her conduct was within the general scope of her employment at the Foundation, and that the Lenoirs' claim against her could have been brought against the "governmental unit (the Foundation)" that employed her. Relying on the same provision, Dr. Huang asserted that he was an employee of the University of Texas Health Science Center at Houston and was overseeing the work of medical residents, including Dr. Gonski, at the UTP clinic as part of that employment. All parties presented affidavits and other evidence to the trial court. Following a hearing on the motions, both physicians were dismissed from the suit.

In this interlocutory appeal,[2] the Lenoirs argue that the trial court erred by dismissing the claims against the physicians because they did not establish that they met the statutory definition of governmental unit employees.

### Standard of Review

Generally, we review a trial court's order on a motion to dismiss under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). However, the proper standard of review is not necessarily determined by the caption of the motion to which the order relates, rather it is determined by the substance of the issue to be reviewed. *Singleton v.*

---

[2] A party against whom a dismissal order is entered based on governmental immunity may bring an interlocutory appeal of that order. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(8) (West Supp. 2014).

4

*Casteel*, 267 S.W.3d 547, 550 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Here, the motions to dismiss raised the issue of immunity. *See id.*; *see also Franka v. Valasquez*, 332 S.W.3d 367, 371 n.9 (Tex. 2011) (stating that Section 101.106 confers immunity in some instances to employees of governmental units). If immunity applies, the trial court lacks subject-matter jurisdiction over the case. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *see also Univ. of Tex. Health Sci. Ctr. at San Antonio v. Webber–Eells*, 327 S.W.3d 233, 240 (Tex. App.—San Antonio 2010, no pet.). Subject-matter jurisdiction is a question of law which we review de novo. *Miranda*, 133 S.W.3d at 226. Likewise, matters of statutory construction are reviewed under a de novo standard. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003); *see Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009).

## Sovereign Immunity and Section 101.106 Dismissal

By common law, the State is immune from suit unless it consents by waiving immunity. *Tex. Adjutant General's Office v. Ngakoue*, 408 S.W.3d 350, 353 (Tex. 2013); *Dallas Cnty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex. 1998). The State may waive immunity to the degree it sees fit, taking into account public policy and financial considerations. *See Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 854 (Tex. 2002).

5

A waiver of sovereign immunity is construed narrowly. TEX. GOV'T CODE ANN. § 311.034 (West 2013); *Ngakoue*, 408 S.W.3d at 353.

The Tort Claims Act (TCA) addresses governmental immunity. TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109 (West 2011). Through the TCA, Texas has chosen to establish a limited waiver of immunity in suits against the State for deaths proximately caused by a governmental employee's negligence while acting within the scope of employment if the death was caused by a condition or use of tangible personal property and the governmental unit would, were it a private person, be liable to the claimant under Texas law. *Id.* § 101.021.

The TCA applies both to the State and to governmental units of the State. *See id.* The term "governmental unit" is defined to include the State of Texas, all of its various agencies, political subdivisions, emergency service organizations, and "any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution." *Id.* § 101.001(3).

TCA Section 101.106, titled Election of Remedies, provides a mechanism for dismissal of governmental employees in certain circumstances. It provides:

(a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.

(b) The filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents.

.   .   .   .

(f) If a suit is filed against an *employee* of a governmental unit based on conduct *within the general scope of that employee's employment* and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

TEX. CIV. PRAC. & REM. CODE ANN. § 101.106 (emphasis added).

The Texas Supreme Court has held that any tort action brought against a governmental employee acting in the general scope of her employment is one that "could have been brought under this chapter against the governmental unit," even if the particular tort alleged is one for which immunity has not been waived. *Franka*, 332 S.W.3d at 378, 381 & n.66; *see also Williams v. Nealon*, 394 S.W.3d 9, 13 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (noting that *Franka* removed from defendant-employee burden to show that suit could have been successfully maintained against government). As a result, to obtain summary

7

dismissal under TCA section 101.106(f) in a tort case, the individual defendant has the burden to establish—as a matter of law—two things: (1) she is an employee of a governmental unit (2) working in the general scope of her employment. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f); *Franka*, 332 S.W.3d at 375; *Williams*, 394 S.W.3d at 13.

The election-of-remedies provision forces plaintiffs to decide "at the outset" "whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008); *accord Molina v. Alvarado*, No. 14–0536, 2015 WL 2148055, at *3 (Tex. May 8, 2015); *Kamel v. Sotelo*, No. 01-07-00366-CV, 2009 WL 793742, at *2 (Tex. App.—Houston [1st Dist.] Mar. 26, 2009, no pet.) (mem. op.). If the plaintiff sues the governmental unit, she is forever barred from suing the governmental unit's employees. TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(a); *Molina*, 2015 WL 2148055, at *2–3. If the plaintiff elects, instead, to sue the governmental employee and maintains that the employee acted independently (which could lead to individual liability unlimited by the cap imposed by TCA section 101.023), the plaintiff is forever barred from suing the governmental employer unless the governmental unit consents. *Id.* § 101.106(b); *Garcia*, 253 S.W.3d at 659; *see Ngakoue*, 408 S.W.3d at 357.

Because it is an irrevocable decision, "a plaintiff must proceed cautiously before filing suit and carefully consider whether to seek relief from the governmental unit or from the employee individually." *Garcia*, 253 S.W.3d at 657. This law "strongly favors dismissal of governmental employees." *Anderson v. Bessman*, 365 S.W.3d 119, 124 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see Ngakoue*, 408 S.W.3d at 355. But claims against governmental employees may be pursued if they do not fall within the election of remedies categories created by section 101.106.[3]

> TCA section 101.001(2) defines an "employee" of a governmental unit as
>
> a person, including an officer or agent, who is in the *paid service* of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the *legal right to control*.

---

[3] As explained in *Mission Consolidated Independent School District v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008),

Under the Tort Claim Act's election scheme, recovery against an individual employee is barred and may be sought against the governmental unit only in three instances: (1) when suit is filed against the governmental unit only, *id.* § 101.106(a); (2) when suit is filed against both the governmental unit and its employee, *id.* § 101.106(e); or (3) when suit is filed against an employee whose conduct was within the scope of his or her employment and the suit could have been brought against the governmental unit, *id.* § 101.106(f).

TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2) (emphasis added). The burden is on the individual defendant to show that she was in the paid service of a governmental unit and that the governmental unit had the legal right to control the details of her work. *See Miranda*, 133 S.W.3d at 227–28 ("If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder. . . ."). The court must "take as true all evidence favorable to the nonmovant" and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* "[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Id.*

### Dr. Gonski

Dr. Gonski alleges in her plea to the jurisdiction that she is an employee of a governmental unit, which she identified as the Foundation. Thus, it was her burden to establish, as a matter of law, that she was paid by the Foundation and that it had the legal right to control her work. *See Miranda*, 133 S.W.3d at 227–28. To the extent a fact issue exists on either point, dismissal was in error. *See id.*

Because we conclude that Dr. Gonski has not established that the Foundation had the legal right to control her work, we conclude that the trial court erred by granting her motion to dismiss. Based on this holding, we do not address whether the Foundation is properly considered a governmental unit. To explain our

10

holding, we turn to Dr. Gonski's evidence that she was in the paid service of and under the legal right of control of the Foundation.

## A.     Paid service

It is undisputed that Dr. Gonski received her pay from the Foundation; therefore, she has met this first element.

## B.     Right of control

The second element concerns the legal right of control over Dr. Gonski's work. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2); *Murk v. Scheele*, 120 S.W.3d 865, 867 (Tex. 2003).

The right of control in the context of a medical professional has been repeatedly addressed. *E.g.*, *Murk*, 120 S.W.3d at 865 (holding that UT Health Science Center faculty-physician was properly dismissed because Health Science Center had right to control his work); *Dalehite v. Nauta*, 79 S.W.3d 243 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (concluding that doctor who moved for dismissal was employee of UTMB, not independent contractor, even though UTMB did not control details of diagnoses or treatments he performed); *Smith v. Altman*, 26 S.W.3d 705, 709 (Tex. App.—Waco 2000, pet. dism'd w.o.j.) (affirming denial of summary judgment because of fact issue regarding hospital's right of control over physician). When the medical professional is a resident, the determination of which entity controls her work can be more complicated because

residents are often hired by one institution to work at a second location under the supervision of faculty-physicians employed by a third entity. *See, e.g.*, *Murk*, 120 S.W.3d at 867 (holding that Health Science Center resident was not employee of Health Science Center because resident was paid by another entity, Bexar County Health District, which operated hospital where resident and faculty-physician were both working).

As evidence that the Foundation had the legal right to control her work, Dr. Gonski relies on the affidavit of Dr. Brent King (President of the Board of Directors of the Foundation), the Foundation's UT Graduate Medical Education Resident Handbook, and the Foundation's articles of incorporation and bylaws.

### 1. King affidavit

Dr. King averred that the Foundation appoints residents to the Health Science Center residency program and that, as "a term and condition of their appointment, residents participating in the . . . residency program are obligated to abide by the policies and procedures set forth in the Graduate Medical Education Resident Handbook." Dr. Gonski argues that the requirement that she follow the Foundation's Handbook establishes that the Foundation had the legal right to control the details of her work.

## 2. Handbook

The Foundation's Handbook describes the its role in the Health Science Center's residency program as administrative:

> The Foundation performs administrative and education functions for the benefit of both the Resident Physician and the Program. These functions include, but are not limited to issuance of paychecks and other personnel services, maintenance of records, procurement and administration of benefits provided by the Foundation, and provision of mechanisms for effective coordination of the Programs among the hospitals.

In contrast, the Handbook describes the Health Science Center's role as directorial and managerial. The Handbook lists the resident's responsibilities, termed "conditions of appointment." These include: "accept[ing] the duties, responsibilities, and rotations assigned by the [Center's] Program Director"; meeting the Program's standards for learning and advancement; abiding by the Center's Handbook of Operating Procedures and the policies of the medical school and hospitals to which the resident is assigned; serving at the hospitals to which the Center's Program Director assigns each resident; and participating on the hospital and departmental committees where assigned.

The Handbook states that the residents' provision of medical care must be supervised by residency program faculty: "All patient care must be supervised by qualified faculty." The requirement that faculty supervise residents is repeatedly emphasized: "It is essential that the program provide a closely supervised

experience . . . ." This level of resident supervision "must" be provided because the attending physician "is ultimately responsible for that patient's care." The Handbook further states: "Faculty members functioning as supervising physicians should delegate portions of care to residents, based on the needs of the patient and the skills of the resident." Relatedly, "[e]ach resident must know the limits of his/her scope of authority, and the circumstances under which he/she is permitted to act with conditional independence" from the "supervision faculty members." Thus, the Health Science Center teaching staff determine, along with the Center's Program Director, the level of responsibility assigned to each resident.

The Handbook specifies that the Center's Program Director will establish the mechanism for evaluating residents and will determine, along with the Departmental Chairperson, whether a resident will advance within the program. Resident grievances are resolved by the Program Director and the Department Chairperson. The Foundation's Policy Review Committee's involvement is limited to ensuring that the Center's decision-makers have provided the resident with the requisite notice of unsatisfactory performance and guidance, i.e., a procedural instead of substantive role. Thus, once appointed by the Foundation, reappointment and advancement decisions are made "at the discretion of the Medical School Department Chair and the Program Director."

14

In other words, the Foundation's Handbook instructs the resident to receive training from and follow the directions of the Health Science Center. The Foundation's administrative role in connection with resident's provision of medical care, under the supervision of Center faculty-physicians, does not support the conclusion that the Foundation has the legal right to control the details of the resident's work. *See Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 607 (Tex. 2002) ("merely exercising or retaining a general right to recommend" safety measures does not create a right of control); *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 702 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (stating that requiring independent contractor to abide by premises owner's safety rules and regulations and retaining authority to preclude work from beginning or stop work once it has begun does not establish actual control); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 714 (Tex. App.—Fort Worth 2006, no pet.) (stating that "requirements that a worker comply with applicable laws, regulations and safety requirements that relate to performance of the contract likewise do not constitute evidence that the employer controls the details of how the worker performs his job."). Likewise, retaining the right to terminate Dr. Gonski's residency does not establish a legal right to control the details of her medical work. *See Bell*, 205 S.W.3d at 714.

### 3. Foundation's corporate documents

The Foundation's bylaws also do not demonstrate a right to control. Paragraph Four of the bylaws provides that "[a]ll physicians employed by the [Foundation] for the purpose of serving as a member of the staff of any hospital or hospitals that are neither owned nor operated by the [Foundation] shall, in the performance of their duties as members of the staff of such hospital or hospitals, be subject to the direction and control of the hospital or hospitals upon whose staff he serves." Further, "[n]o physician employed by the [Foundation] shall serve upon the staff of a hospital not owned or operated by the [Foundation] unless and until the governing body of such hospital shall agree in writing to assume full responsibility for the direction and control of the acts of such physician while serving upon the staff of the hospital and shall further agree in writing to hold the [Foundation] harmless from all liability which may arise out of acts performed by such physician while engaged in the scope and course of his duties as a member of the staff of such hospital."

The bylaws also provide that "[n]o director, officer, or employee of the [Foundation] shall be authorized to act on behalf of the [Foundation] to direct or control the acts of any physician employed by the [Foundation] while said physician is serving as a member of the staff of any hospital or hospitals not owned or operated by the [Foundation]. Paragraph Five continues, "Physicians employed

16

by the [Foundation] shall have no authority to engage in the practice of medicine for or on behalf of the [Foundation] except at a clinic, hospital, or other facility owned or operated by the [Foundation] . . . ."

Thus, a medical resident, such as Dr. Gonski, who is selected and paid by the Foundation but is not working at a Foundation-owned hospital, is subject to the "direction and control" of the hospital where she works. Consistent with that division of control and potential for subsequent liability, the hospital where the resident works has to agree, in writing, to control the resident's work and indemnify the Foundation from any resulting liability. Another provision in the Foundation's bylaws states that the Foundation will not indemnify residents with regard to the negligent practice of medicine: "The [Foundation] shall not reimburse or indemnify any . . . employee for any expenses or liability which may be incurred by such . . . employee while engaged in the practice of medicine."

Through its bylaws, the Foundation has disavowed any right to control the work of a resident it appoints to the Health Science Center residency program who is working at a non-Foundation owned facility; the Foundation also has disavowed any liability for medical malpractice that might result from that work.[4]

---

[4] Dr. Gonski argues that we should disregard the bylaws because they "have never been followed, and thus must be considered abandoned," and further, they conflict with the Foundation's articles of incorporation. There is no evidence of abandonment, and the provisions do not conflict. We reject both arguments.

17

Accordingly, we conclude that Dr. Gonski's evidence does not establish, as a matter of law, that the Foundation had the legal right to control her work at UTP clinic, where she was treating Shana. Dr. Gonski makes several arguments for a contrary conclusion. We consider each in turn.

## C.     Medical discretion is not analogous

Dr. Gonski analogizes the limitations on the Foundation's ability to control her work to the concept of medical discretion discussed by the Texas Supreme Court in *Murk v. Scheele*, 120 S.W.3d 865 (Tex. 2003). In that case, the plaintiffs sued a physician employed by the Health Science Center. *Id.* at 867. The plaintiffs agreed that the physician met the first element to qualify as an employee of the Health Science Center—i.e., he was paid by it—but they contended that he failed to meet the second requirement of control by the governmental unit because a physician "exercise[s] . . . independent professional judgment" so that the physician's employer cannot be said to control the details of her work. *Id.*

The Court rejected the argument, holding that the "exercise [of] some independent medical judgment" does not take the physician out of the definition of an employee if the physician's "practice is controlled by [the] governmental unit." *Id.* According to the Court, the physician's medical decisions "were subject to regimens prescribed by" the Health Science Center, including its requirement that the physician participate in daily rounds, be supervised and reviewed by other

18

Health Science Center physicians, and have his decisions vetoed by more senior Health Science Center physicians. *Id.* "While the nature of his practice as a physician required him to make many medical decisions using his own professional judgment, the necessity for that judgment did not, by itself, vitiate [the Health Science Center]'s right to control the details of his practice." *Id.* (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 542 (Tex. 2003), and *Dalehite*, 79 S.W.3d at 245–46).

We do not view *Murk* to support Dr. Gonski's arguments. Rather, to the extent that case is applicable, it better supports the conclusion that a doctor working under the guidance of Health Science Center physicians is subject to the Health Science Center's control.

**D.   Clinical setting is not dispositive**

Next, Dr. Gonski argues that that the provision in the bylaws disavowing any right to control simply does not apply because "the care at issue did not occur in any hospital, but at a Clinic." The distinction is unconvincing. Paragraphs four and five, when read together, require that a resident working at a location not owned by the Foundation be under the control of the entity operating that location. We disagree that this limitation applies only to hospitals and not clinics or other medical facilities. Further, the Program Director for the Health Science Center Residency Program to which Dr. Gonski was appointed explained that the UTP

clinic is an "internal site" of the Health Science Center, which means that it was not owned by the Foundation.

**E.     In distinguishing actual control from legal control, Dr. Gonski still offers no evidence of right of control**

Finally, Dr. Gonksi argues that actual control is a distinct legal concept from legal right of control and cases analyzing actual control are inapposite. On this basis, she seeks to distinguish *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513 (Tex. 2003), which involved a similar disavowment of the right to control a resident's work. There, St. Joseph Hospital, which ran the resident's training program in Houston, entered into a contractual relationship with CTMF to allow St. Joseph residents additional medical experience at hospitals outside of Houston. *See id.* at 520–21. The contract stated that St. Joseph did not have the right to control the work of its residents while assigned to CTMF for training. *Id.* at 522-23. The Texas Supreme Court held that that provision "makes it clear that St. Joseph in Houston had no direct control over 'the details of the medical tasks performed by residents'" assigned to CTMF and treating patients at Brackenridge Hospital in Austin. *Id.* at 543. Thus, the Court concluded that St. Joseph Hospital was not vicariously liable for its resident's actions while at Brackenridge Hospital. *See id.*

First, we note that the Foundation's connection to Dr. Gonski is even more removed than St. Joseph's connection to its resident. St. Joseph paid the resident, was the entity that operated the residency program through which he was taught,

20

and managed his instruction while at its Houston hospital. It was only when the resident was assigned to Brackenridge Hospital in Austin that St. Joseph was not controlling his work.

Here, by contrast, the Foundation played only an administrative role, supporting another entity's residency program. The evidence does not suggest that the Foundation played any role in training or supervising the residents; instead, that responsibility belonged to the Health Science Center and its faculty-physicians. Thus, the Supreme Court's analysis in *Wolff* presumed that St. Joseph had a legal right of control (when the resident was working at its Houston hospital) that simply has not been established in this case with regard to Dr. Gonski and her alleged employer, the Foundation. *See id.* at 542–43.

Second, to determine whether an individual defendant meets the statutory definition of an employee under the TCA for dismissal, the TCA relies on the same "supreme test" of right of control as discussed in *Wolff* and other contexts. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2) (defining "employee" to exclude any person "who performs tasks the details of which the [employer] governmental unit does not have the legal right to control"); *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 590 (Tex. 1964) (stating that "right of control" is "supreme test" to determine employment status); *see also Olivares v. Brown & Gay Eng'g, Inc.*, 401 S.W.3d 363, 368–78 (Tex. App.—Houston [14th Dist.] 2013) (reviewing decision

21

on plea to jurisdiction of alleged governmental unit employee under "right of control" test), *aff'd*, 2015 WL 1897646 (Tex. Apr. 24, 2015); *Altman*, 26 S.W.3d at 709 (analyzing sovereign immunity claim under "right to control" standard).

The record is devoid of any evidence that the Foundation had the legal right to control Dr. Gonski's work. To the extent the Foundation placed requirements on the residents through its Handbook, the record also supports the conclusion that the Foundation required them to abide by the rules of the Health Science Center, follow directions from Health Science Center staff, and submit to their evaluations and advancement decisions.

The Foundation's Handbook and corporate documents, as well as the affidavit of its board president, establish that the Foundation plays an administrative role in support of the Health Science Center's residency program by appointing residents, issuing the residents' paychecks, and coordinating efforts for the Health Science Center's provision of training. This does not conclusively demonstrate that the Foundation had a legal right to control the details of Dr. Gonski's work, even if we were to accept Dr. Gonski's effort to distinguish legal right of control from the Health Science Center's actual control.

## F.    Foundation and Health Science Center are separate entities

Dr. Gonski attempts to avoid a negative result from being paid by the Foundation but under the right of control of the Health Science Center by noting

the two entities' relatedness. She argues that the Foundation "is not wholly unrelated" from the Health Science Center and, thus, being paid by one and under the control of the other should not take her out of the definition of a governmental unit employee. For support, Dr. Gonski refers us to this Court's earlier decision, *Kamel v. Sotelo*, No. 01-07-00366-CV, 2009 WL 793742 (Tex. App.—Houston [1st Dist.] Mar. 26, 2009, no pet.) (mem. op.).

*Kamel* does not apply. There, the resident took the opposite position and claimed to be an employee of the Health Science Center, even though her paychecks were paid from a Foundation account. *Id.* at *3. This Court noted that there was no evidence to suggest that the Foundation was a separate entity from the Health Science Center, such that the resident would fail to meet the statutory requirement that the governmental unit that employed her both paid her and controlled her work. *Id.* at *5 & n.8. Here, there is evidence in the record that the two entities are distinct. The record contains the Foundation's articles of incorporation and bylaws, which establish its separateness from the Health Science Center.

Moreover, Dr. Gonski took the position, in her underlying motion to dismiss, that she was supplying the evidence that was lacking in *Kamel* for the express purpose of establishing that she was an employee of the Foundation, not

23

the Health Science Center as the *Kamel* resident had asserted. Dr. Gonski explained:

> This Motion carefully establishes the identity of the Foundation as Dr. Gonski's true employer due, in part, to vague, past opinions addressing the employment status of [Health Science Center] resident physicians, which have not included an explanation of the relationship between [the Health Science Center], its residents, and the Foundation, which is undertaken here. *See e.g.*, *Kamel v. Sotelo . . . .*

## G.    Conclusion

Dr. Gonski has not shown, as a matter of law, that the Foundation had the legal right to control her work. Without establishing that a governmental unit has the legal right to control her work, a movant cannot establish that she is the employee of that entity to obtain dismissal under the election-of-remedies provision.[5] *See* TEX. CIV. PRAC. & REM. CODE § 101.001(2) (defining "employee" eligible to take advantage of Tort Claims Act to exclude any person "who performs tasks the details of which the [employer] governmental unit does not have the legal right to control"); *id.* § 101.106(f) (mandating dismissal of "employee" of governmental unit acting within general scope of employment if suit could have been brought under TCA against governmental unit); *see Adkins v. Furey*, 2 S.W.3d 346, 348 (Tex. App.—San Antonio 1999, no pet.) (holding that medical

---

[5]    Because we conclude that Dr. Gonski failed to establish as a matter of law that she was the employee of the Foundation, for TCA purposes, we do not reach the Lenoirs' alternative arguments that the Foundation was not a governmental unit entitled to immunity or that Dr. Gonski's conduct was not within the scope of her employment but was ultra vires.

resident failed to conclusively establish that he was employee of Health Science Center that ran his residency program instead of hospital where he was working, and stating that employment was issue for jury); *cf. Harris Cnty. v. Dillard*, 883 S.W.2d 166, 168 n.3 (Tex. 1994) (concluding that overly expansive reading of definition of "employee" would "reflect[] a view of governmental immunity not shared by the Legislature."). Accordingly, we conclude that the trial court erred in granting Dr. Gonski's motion to dismiss. We sustain the Lenoirs' first issue.

## Dr. Huang

Dr. Huang is a licensed physician who worked at the Health Science Center for nearly 20 years as an associate professor in the department of obstetrics, gynecology, and reproductive sciences. According to Dr. Huang, the Health Science Center employs physicians to provide two forms of professional medical services: (1) to educate and train medical students and residents and (2) to provide inpatient and outpatient medical care to patients. Dr. Huang averred that he was required to provide medical care to patients in assigned hospitals and out-patient clinics, including UTP clinic, and to supervise and train the Health Science Center's residents in those locations. When Shana was treated at the UTP clinic by Dr. Gonski, Dr. Huang was the attending physician, charged with supervising the medical residents there that day.

The Lenoirs do not dispute that the Health Science Center is a governmental unit. Instead they argue that (1) Dr. Huang was not in the "paid service" of the Health Science Center, (2) he was an independent contractor as a matter of law because the medical practice at the UTP clinic was an "auxiliary enterprise" and, by statute, those who work for auxiliary enterprises are "contractors," (3) the Health Science Center did not control the details of his work, and (4) his actions were *ultra vires* and, therefore, not within the scope of his employment.

## A.    Paid service

Dr. King, the Health Science Center Executive Vice Dean for Clinic Affairs, averred that, under Health Science Center policies, all physicians' professional fees are required to be deposited into a trust account for the Health Science Center's benefit. He explained that "[a]ll patient fees and other professional income generated by the [Health Science Center] faculty physician[s] are assigned to and become property of the [Health Science Center] to be held in the . . . trust fund account . . . to pay its faculty physicians' salaries and fringe benefits, as well as for institutional development," "to pay for research, equipment, development of new programs, and the endowment of chairs and professorships," as well as "administrative expenses associated with patient billing and collections." Thus, the fees generated by Dr. Huang's professional work at the UTP clinic were placed in an account for the benefit of the Health Science Center, which used the funds for a

variety of expenditures, only one of which was Dr. Huang's and other physicians' compensation. Dr. Huang confirmed in his affidavit that his compensation for "in-patient and out-patient professional medical services" was "solely received" from the Health Science Center.

The Lenoirs argue that Dr. Huang was not in the "paid service" of the Health Science Center because payment for his services were made by outside sources and deposited into a trust account. However, the only entity authorized to remove funds from the trust account was the Health Science Center and it was within the Health Science Center's discretion where to expend those funds once withdrawn. Only a portion of the trust funds were used by the Health Science Center to compensate Dr. Huang. There is no evidence that Dr. Huang was paid by any source other than Health Science Center funds from the trust account. According, we conclude that Dr. Huang was in the paid service of the Health Science Center.

**B.      Employee versus auxiliary-enterprise independent contractor**

Next, the Lenoirs argue that Dr. Huang was an independent contractor working for an auxiliary enterprise instead of an employee of the Health Science Center. For support, the Lenoirs point to Government Code section 2252.061, which defines "auxiliary enterprise" to mean "a business activity that is conducted at a state agency, provides a service to the agency, and is not paid for with appropriated money." TEX. GOV'T CODE ANN. § 2252.061(1) (West 2008). The

27

Lenoirs contend that UTP clinic provided a service that was not paid with appropriated funds and, therefore, was an auxiliary enterprise. The auxiliary enterprise statute also provides that "an individual, association, corporation, or other business entity that operates an auxiliary enterprise or performs a service of the auxiliary enterprise" is a "contractor." *Id.* § 2252.061(2). The Lenoirs contend that, under these two provisions, Dr. Huang is a "contractor" instead of an employee.

Under the Lenoirs' analysis, the term "contractor" is synonymous with "independent contractor," which would exclude Dr. Huang from the statutory definition of a governmental employee. We find nothing in the statute to support this approach. Instead, to address whether Dr. Huang is an "employee" as defined by the TCA, we must determine whether the governmental unit had the "legal right to control" his work. TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(2) (defining employee); § 101.106(f) (mandating dismissal of governmental unit employee acting within general scope of employment if suit could have been brought against governmental unit under TCA). Accordingly, we focus our analysis on whether the Health Science Center had the legal right to control Dr. Huang's work.

## C.    Legal right to control work

The Management Agreement between the Health Science Center and the UTP clinic provided that the Health Science Center "has requested [UTP] to assist

[it] with certain functions to support the provision of health care by faculty physicians of [the Health Science Center]." The UTP clinic was contractually required to provide the Health Science Center with medical offices, furnishings, clinic equipment, and business and clinical supplies. The UTP clinic was required to supply "non-physician personnel reasonably necessary for [the Health Science Center]'s practice" at the medical offices. The agreement further provided that UTP "shall be responsible for all non-medical operations of [the Health Science Center]'s practices at the Offices," including scheduling, maintaining patient records, marketing, billing, and collections. The Health Science Center, on the other hand, was required "at all times [to] be responsible for the quality of medical care practiced at the Offices."

Dr. Huang had a written agreement with UTP. That agreement did not purport to be an employment agreement. Instead, it was a "participation agreement" through which Dr. Huang agreed to "participate in" the clinic's "professional activities." In turn, UTP agreed "to arrange for the delivery of health care services to patients . . . by its participating physicians . . . ." *Cf. Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 915 (Tex. App.—Fort Worth 2009, pet. denied) (holding that agreement between doctor and hospital was not employment agreement but, instead, addressed logistics necessary to provide hospital's on-call coverage requirements).

The agreement also provided that Dr. Huang would accept new patients unless the Health Science Center provides UTP written notice otherwise. If such notice were given by the Health Science Center, Dr. Huang would have been prohibited, under the terms of his agreement with UTP, from accepting any new patients. Thus, the agreement gave the Health Science Center control over whether Dr. Huang could see new patients at the UTP clinic.

According to Dr. Huang's affidavit, the Health Science Center also controlled his work schedule at the clinic. He averred: "I was assigned to be at the [UTP] clinic during the afternoon [of Shana's medical treatment] by the Department of Obstetrics, Gynecology, and Reproductive Sciences at [the Health Science Center]." He also averred that "providing professional medical services at the [UTP] clinic [on that day] was a condition of my employment with [the Health Science Center] and was a part of my patient care and teaching responsibilities with [the Health Science Center]."

There is no indication that a UTP clinic employee or manager supervised Dr. Huang's clinic work. Neither is there evidence that his clinic participation was distinct from his obligation, as a Health Science Center physician, to provide out-patient care for the community and training for the medical residents. In fact, the UTP participation agreement stated that Dr. Huang was required to retain his faculty status at the Health Science Center to qualify for participation. If Dr. Huang

30

left his Health Science Center faculty position, his participation at UTP would "be automatically terminated."

Thus, the agreement between UTP and Dr. Huang is reasonably viewed as an agreement between UTP and a Health Science Center physician, not a physician who also happens to teach at the Health Science Center. The evidence supports the conclusion that it was the Health Science Center, and not UTP, that held the legal right to control Dr. Huang's provision of medical care at the clinic.

## D.  Acting within scope of employment

The Lenoirs' final challenge to Dr. Huang's assertion that he was an employee of the Health Science Center questions whether he was acting within the scope of his employment with the Health Science Center when he oversaw Dr. Gonski's care of Shana.

"Scope of employment" is defined by the TCA as the performance "of a task lawfully assigned to an employee." TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(5). An employee's "scope of authority extends to job duties to which the official has been assigned, even if the official errs in completing the task." *Lopez v. Serna*, 414 S.W.3d 890, 894 (Tex. App.—San Antonio 2013, no pet.); *see Anderson*, 365 S.W.3d at 126 ("If the purpose of serving the employer's business motivates the employee, his acts are within the scope of employment.").

Dr. Huang's work included educational, research, and administrative services provided at Health Science Center-affiliated hospitals and clinics. He taught and supervised residents participating in the Health Science Center's residency program. This supervision occurred at Memorial Hermann Hospital and in clinical settings, including the UTP clinic. According to Dr. Huang's affidavit, his Health Science Center employment required him to supervise these residents. He was the assigned attending physician at the UTP clinic on the day Shana received treatment there and, in that capacity, was required to supervise Dr. Gonski and other residents providing care at the clinic. We, therefore, conclude that Dr. Huang was performing a task assigned to him by his employer and acting within the scope of his employment with regard to Shana's treatment.

The Lenoirs argue that Dr. Huang is not entitled to dismissal despite this conclusion because his actions were *ultra vires*, meaning that they were unauthorized and beyond the authority provided to him by his employer, due to Medicaid billing errors. In support of their argument, the Lenoirs rely on a 1987 case that held that "[u]nlawful or unauthorized actions are not considered acts of the State" and State officials can be sued in their individual capacities for wrongful, unofficial acts. *Bagg v. Univ. of Tex. Med. Branch at Galveston*, 726 S.W.2d 582, 585–86 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). However, the reasoning of this case has been rejected. *See, e.g.*, *City of Elsa v.*

32

*M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007); *Tex. State Technical Coll. v. Cressman*, 172 S.W.3d 61, 66 (Tex. App.—Waco 2005, pet. denied). The issue is not whether Dr. Huang's conduct was somehow "unlawful or unauthorized"; it is, instead, whether Dr. Huang acted within or outside the scope of his employment. *See Alexander v. Walker*, 435 S.W.3d 789, 792 (Tex. 2014); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994).[6]

As more recent case law has established, an employee acts within the general scope of his employment if he is discharging the duties generally assigned to him even if he does so in a negligent manner. *See City of Lancaster*, 883 S.W.2d at 658; *Hopkins v. Strickland*, No. 01-12-00315-CV, 2013 WL 1183302, at *3 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.); *Lopez*, 414 S.W.3d at 894–95; *Anderson*, 365 S.W.3d at 126. Similarly, a governmental employee can act within the scope of his employment, even if it is later determined that some error was committed in connection with his actions. *See Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 425 (Tex. 2004) (concluding that board

---

[6] The Lenoirs' reliance on *City of El Paso v. Heinrich*, 284 S.W.3d 366 (Tex. 2009), is likewise misplaced. The portion of that opinion on which the Lenoirs rely is concerned with declaratory judgment actions against state officials acting outside of their authority. *Id.* at 373 & n.7. It has no application to this suit against Dr. Huang for damages. In the referenced footnote, the Texas Supreme Court acknowledges that state officials may be sued in their individual capacity but notes that such suit would be for "conduct fairly attributable to the officer himself," meaning outside of his general scope of employment. *Id.* at 373 n.7 (citing *Alden v. Maine*, 527 U.S. 706, 757, 119 S. Ct. 2240, 2267–68 (1999)).

of adjusters members were discharging duties assigned to them even though later judicial decision established that board action was incorrect).

Section 101.106(f) states that a suit against a governmental employee in his individual capacity "is considered to be against the employee in the employee's official capacity only" if the suit is "based on conduct within the general scope of that employee's employment . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(f). In other words, a suit against an employee acting within the scope of his employment is "in all but name only, a suit against the governmental unit." *Ngakoue*, 408 S.W.3d at 357. "Conversely, suits against an employee based on conduct outside the scope of employment are suits against an employee in his individual capacity and seek personal liability." *Molina v. Alvarado*, No. 14-0536, 2015 WL 2148055, at *2 (Tex. May 8, 2015) (citing *Alexander*, 435 S.W.3d at 791); *cf. City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n.7 (Tex. 2007). The election-of-remedies provision forces the plaintiff to decide at the outset whether the employee acted independently or within the general scope of his employment. *Molina*, 2015 WL 2148055, at *3; *Garcia*, 253 S.W.3d at 657. Here, the Lenoirs elected to proceed under the theory that Dr. Huang acted independently. We, however, have determined that he was acting within the scope of his authority with regard to the allegations of medical negligence asserted against him. Accordingly, Dr. Huang was entitled to dismissal under section 101.106(f).

Accordingly, we overrule the Lenoirs' second issue.

## Challenge to Affidavits

In the Lenoirs' final issue, they challenge affidavits relied on by Dr. Huang in support of his motion to dismiss. The Lenoirs objected to an assertion in Dr. Huang's affidavit that he "was in the paid service of" the Health Science Center on the day Dr. Gonski treated Shana and to the affidavit of the Health Science Center's Senior Executive Vice President confirming Dr. Huang's statement. The Lenoirs objected that these affidavits were "legally conclusory and factually incorrect" based on their legal argument that UTP was engaged in an "auxiliary enterprise" because the fees charged to the clinic's patients passed through a trust fund before ultimately being used by the Health Science Center to pay its physicians' salaries.

The Lenoirs further objected to the affidavits of the Health Science Center's residency program director and the Foundation's president. The Lenoirs again allege that these affidavits contain "legal conclusions not supported by facts."

The trial court did not rule on the Lenoirs' objections.

## A.    Standard of review

An objection that an affidavit is conclusory "is an objection to the substance of the affidavit that can be raised for the first time on appeal." *Skelton v. Comm'n for Lawyer Discipline*, 56 S.W.3d 687, 692 (Tex. App.—Houston [14th Dist.]

2001, no pet.); *Green v. Indus. Specialty Contractors, Inc.*, 1 S.W.3d 126, 130 (Tex. App.—Houston [1st Dist.] 1999, no pet.). The Lenoirs did not have to obtain a ruling on their objections to preserve this issue for appeal. *Green*, 1 S.W.3d at 130. We review an assertion of trial court error regarding the admissibility of evidence under an abuse of discretion standard. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000).

**B.    Affidavits were not conclusory**

Conclusory statements in affidavits are insufficient to establish the existence of a fact. *See, e.g.*, *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*, 198 S.W.3d 434, 442 (Tex. App.—Dallas 2006, no pet.). "A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Weech v. Baptist Health Sys.*, 392 S.W.3d 821, 826 (Tex. App.—San Antonio 2012, no pet.). Thus, an affidavit that is merely a sworn statement of the allegations in a pleading or that simply paraphrases statutory language is conclusory and lacks probative force. *See Selz v. Friendly Chevrolet, Ltd.*, 152 S.W.3d 833, 837 (Tex. App.—Dallas 2005, no pet.); *Nichols v. Lightle*, 153 S.W.3d 563, 570 (Tex. App.—Amarillo 2004, pet. denied). On the other hand, logical conclusions are not improperly conclusory if they are based on underlying

facts stated in the affidavit or its attachments. *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex. App.—Houston [1st Dist.] 1997, no pet.).

The Lenoirs' contention that the affidavits are conclusory does not hinge on whether there are facts in the attached documents to support the statements made in the affidavits. Each of these affiants refers to documents or attaches them to the affidavits. These attachments include accrediting agency regulations, articles of incorporation, bylaws, and other supporting documents. The documents support the assertions made in the affidavits. *See id.*

Rather, they contend that the affidavits are "legally conclusory and factually incorrect" because—despite these affiants' understanding of the relationship Dr. Huang had with the UT entities and despite what the attached documents say— Lenoir's legal arguments have effectively *undone* the employment relationship.

These affidavits explain the interrelationship of the entities within the UT System and Dr. Huang's role and connection to those entities. We do not agree that an explanation of the UT System structure becomes inadmissible simply because a party argues that the law should interpret the facts differently. Because we have rejected the Lenoirs' legal contentions challenging Dr. Huang's employment, we likewise reject their assertion that the statements are conclusory.

Accordingly, we overrule the Lenoirs' third issue.

## Conclusion

We overrule the Lenoirs' challenge to the dismissal of Dr. Huang. We further overrule their challenge to the affidavits attached to his motion to dismiss. We sustain the Lenoirs' issue challenging the dismissal of Dr. Gonski and, therefore, reverse that part of the trial court's judgment and remand for further proceedings against Dr. Gonski.

Harvey Brown
Justice

Panel consists of Justices Massengale, Brown, and Huddle.